IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID A. DOWS,                          )
                 Plaintiff              )
                                        )
         v.                             )   CIVIL ACTION NO. 04-341 ERIE
                                        )
KATHERINE E. HOLTZINGER CONNER,         )
ESQ., et al.,                           )
                 Defendants             )


HEARING ON DEFENDANTS' MOTION TO DISMISS


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Wednesday, June 29, 2005.


APPEARANCES:
                 WILLIAM TAGGART, Esquire, appearing on behalf of
                 the Plaintiff.

                 LINDA S. LLOYD, Esquire, Senior Deputy Attorney
                 General, appearing on behalf of the Defendant.


Ronald J. Bench, RMR - Official Court Reporter

2

<u>P R O C E E D I N G S</u>

(Whereupon, the proceedings began at 1:28 p.m., on Wednesday, June 29, 2005, in Courtroom C.)

THE COURT:  All right, this is the time we set for argument on the defendants' motion to partially dismiss the amended complaint.  I've had an opportunity to read the briefs, I'm conversant with them, I think.  Before we start here, though, by way of maybe clearing out some of the underbrush, Mr. Taggart, let me ask you some questions, if I could, which might go a long way towards streamlining our discussion before we get into the argument.  Would you mind coming up to the podium.

MR. TAGGART:  Not at all.

THE COURT:  Now, the problem, I will say, is probably mine, but I have read the amended complaint a number of times and, quite frankly, in some particulars I've had some difficulty following it.  And, thus, my need for some clarification.  At paragraph nine of your complaint, you talk about the dismissal without just cause on or about October 10, 2003?

MR. TAGGART:  Yes.

THE COURT:  And you indicate that discharge was the subject of an EEOC charge, which you say has been partially

3

1    resolved?

2            MR. TAGGART:  Yes, your Honor.

3            THE COURT:  What does that mean, I mean was there a

4    distinct and final settlement that grew out of that alleged

5    inappropriate activity?

6            MR. TAGGART:  Specifically, here's exactly what

7    happened.  I was leery of discussing it in detail because

8    there's a confidentiality agreement about the settlement.

9            THE COURT:  You don't have to give me the specifics,

10   but was there a payment and a release releasing the Erie County

11   Office of Children and Youth from any liability arising out of

12   his discharge and the events which were the subject matter of

13   an EEOC charge?

14           MR. TAGGART:  Yes.

15           THE COURT:  All right.  So is it fair to say that

16   that really is just background insofar as this new lawsuit is

17   concerned?

18           MR. TAGGART:  Yes.

19           THE COURT:  Okay.  Now, is this a disparate impact

20   case or is this a disparate treatment case?

21           MR. TAGGART:  The maintenance of the list --

22           THE COURT:  Because it sure smells like a disparate

23   impact case the way you've pled it -- in this sense --

24           MR. TAGGART:  The maintenance of the list --

25           THE COURT:  That's disparate impact?

4

1          MR. TAGGART:  Yes.

2          THE COURT:  In other words, is the theory -- well,

3    let me see if I got the theory right.  And recognizing that

4    Erie County Office of Children and Youth is not a defendant in

5    this case, it's just the Commission?

6          MR. TAGGART:  Right.

7          THE COURT:  The theory is that the Commission

8    maintains two lists and I'm paraphrasing this, if you will --

9    one are, broadly speaking, are interns, if you will, and the

10   others are non-probationary, permanent employees, merit

11   employees, if you will.  The theory is that overwhelmingly the

12   people who make up the non-merit list, if you will, are younger

13   females?

14         MR. TAGGART:  Correct.

15         THE COURT:  And that presumably the flip side of

16   that is the majority of people who make up the merit list are

17   older males?

18         MR. TAGGART:  I'm going to have to be clear.  My

19   client filed various information requests outside of the

20   lawsuit, with the Civil Service Commission, and they have not

21   provided that data to him.  However, antidotally, if you will,

22   that's our sense of it.

23         THE COURT:  Okay.  So going forward then in time,

24   the essence, as I understand it, of your claim -- you are

25   seeking damages as a result of the failure of Erie County

5

1    Office of Children and Youth to have hired, if you will, to

2    have rehired your client between October 10th and May 17th,

3    2004, is that right?

4            MR. TAGGART:  Yes, it then generated a number of

5    negative results.

6            THE COURT:  Okay.  Now, during that, and the theory

7    is, insofar as the Commission was concerned, that it was their

8    custom or practice when it became necessary for county offices,

9    such as this one, to fill a vacancy or vacancies, that rather

10   than peel off first from the merit list, they would peel off

11   first from the intern or non-merit list, is that right?

12           MR. TAGGART:  That's our understanding.

13           THE COURT:  In other words, the Commission -- a

14   request would be made for a person to fill a vacancy; and is it

15   your theory that it then fell to the Commission, and the

16   Commission only, to determine who would be sent to the County

17   to replace whoever needed to be replaced?

18           MR. TAGGART:  If the County had chosen to

19   participate, yes.

20           THE COURT:  When you say participate, you mean

21   participate in the Civil Service list?

22           MR. TAGGART:  Yes.

23           THE COURT:  And this County did?

24           MR. TAGGART:  Yes.

25           THE COURT:  All right.  Now, during this period of

6

1    time, and I'm running from memory of your complaint, you plead

2    that there were a number of vacancies came up, and there were

3    several people that were placed in positions with the County,

4    if memory serves, all female and all younger, is that right?

5            MR. TAGGART:  Yes.

6            THE COURT:  And your theory insofar as the manner in

7    which the Commission would send people to fill vacancies with

8    Erie County Office of Children and Youth is it by virtue of the

9    nature of their list, meaning a non-tenured list, younger and

10   female, I'm using the term tenure in a different sense, a merit

11   list, presumably older and male, that the maintenance of that

12   list served to work a disparate impact; is that in part true?

13           MR. TAGGART:  Yes.

14          THE COURT:  All right.  Do you also allege or is it

15   your contention that aside from just a good old disparate

16   impact case -- which really doesn't require under the law evil

17   motive or sex or age driven motive, is it your contention that

18   the Commission in various particulars was also guilty of

19   intentional -- in other words, disparate treatment, as opposed

20   to simply running a list that had a capacity to disparately

21   impact?

22          MR. TAGGART:  Yes, that is our contention.  That is

23   relegated to the 1983 claim as well in that we believe that

24   given --

25          THE COURT:  I'm just on Title VII right now.  So

7

1    it's a disparate impact and disparate treatment case?

2            MR. TAGGART:  Correct.

3            THE COURT:  So is it your theory that the

4    Commission, through its agents, by the agents I mean the people

5    who would have ultimately been responsible for assigning these

6    Civil Service people, the interns would not have been Civil

7    Service people anyways, would they?

8            MR. TAGGART:  That's part of what we would try to

9    understand better in discovery.  It's not clear to us why the

10   intern list is maintained at all by the Civil Service

11   Commission.

12           THE COURT:  And I'm trying to understand how this

13   works and I presume Ms. Lloyd may be able to educate me on the

14   interaction between these two entities.  But at the end of the

15   day, does Erie County have to accept anybody that the

16   Commission sends to them?

17           MR. TAGGART:  It's agreed by participation in the

18   Civil Service activity, it has agreed to accept, assuming the

19   individual meets minimal criteria.

20           THE COURT:  Right.

21           MR. TAGGART:  Which is truly minimal, and then

22   functions effectively.  And you may recall that Mr. Dows was

23   parked on the sideline while the County attempted to remove him

24   from the list on the theory that he was not qualified.

25           THE COURT:   I completely did not understand that

8

1  part of your pleading, I have to be honest with you.

2            MR. TAGGART:  It reflects on me.

3            THE COURT:  Maybe it reflects on me, but here's my

4  point.  You say, the thrust of your pleading is that the

5  Commission tried to talk Erie County into taking Mr. Dows off

6  the list; it made no sense to me, how can Erie County influence

7  the Commission -- if the Commission didn't want him anymore,

8  they could have thrown him off itself?

9            MR. TAGGART:  Presumably they can act pro se.  There

10  is a hearing process because it's considered a vested right,

11  this 14th Amendment aspect.  But what happened here is that the

12  County petitioned with the Civil Service Commission to remove

13  Mr. Dows from the list and the Commission has a procedure to

14  handle those situations.

15            THE COURT:  And they said ultimately no?

16            MR. TAGGART:  And ultimately they said no, but --

17            THE COURT:  What harm did that cause?

18            MR. TAGGART:  Several things.  Number one, we

19  believe that the instigator of doing it was not the County, but

20  a Civil Service Commission employer/employee who is currently

21  unknown to us, thus the John Doe aspect.

22            THE COURT:  So, in other words, the theory is they

23  went to the County or some John Doe and for some reason told

24  the County to petition to have him removed from the list, is

25  that right?

9

1          MR. TAGGART:  Yes, our theory is that in effect they

2    said look, if you don't want to deal with this guy, then you

3    have to hire these people, this will tie him up for months,

4    because he's not considered during that period, and during that

5    time you can carry out your hiring, which were these younger

6    and female persons mentioned in --

7          THE COURT:  What would be their motivation to do

8    that?

9          MR. TAGGART:  To this moment I'm still trying to

10   determine their interest in doing that.

11         THE COURT:  Maybe there is some, but what difference

12   would it make to them -- well, first of all, let me ask you

13   this.  Under the rules of the Civil Service Commission, and

14   your client was a Civil Service employee, is that right?

15         MR. TAGGART:  Correct.

16         THE COURT:  Isn't there an internal operating

17   procedure, isn't there a pecking order which delineates the

18   manner or method in which people are taken off the list for

19   placement?

20         MR. TAGGART:  As to the merit list, that is the

21   order, during the life of the list, that is the order that

22   people are on it and Mr. Dows --

23         THE COURT:  When you say the order, in terms of

24   seniority and --

25         MR. TAGGART:  Grade actually.

10

1          THE COURT:  And grades, how they did on the test?

2          MR. TAGGART:  Exactly.

3          THE COURT:  So you take the top guy first, the next

4     person, the next person next until you -- then the people that

5     they were using to fill these positions that were not part of

6     that graded list but were interns -- is intern the right word,

7     is it a temporary employee?

8          MR. TAGGART:  Well, it seems to be --

9          THE COURT:  Is it a temporary employee?

10          MR. TAGGART:  No, they become, they're hired as

11     permanent full-time, but they're on probationary status in I

12     think their first 90 days or six months, one or the other.

13          THE COURT:  Under the rules and regulations of the

14     Commission, and I presume they are entitled to have these two

15     different classes of employees, because they have them -- under

16     what circumstances is the Commission permitted to place an

17     intern in an open position, as opposed to going in the first

18     instance to someone off the permanent list?

19          MR. TAGGART:  The Commission has yet to answer that

20     question.  The intern list, its very basis for existing, from

21     the Commission's viewpoint, is not clear.  We believe that the

22     interest from the recipient County's viewpoint is that they

23     then get additional funding or subsidizing from the

24     Commonwealth if they hire these interns.  So I think the County

25     has an economic motive.  As to the Commission, the court's

11

1    probably aware from other cases that there can be certified

2    apprentice programs and you can hire off of those certified

3    programs and be exempt from the concerns that are in this

4    lawsuit.

5            THE COURT:  Now, on May 20th, Debra Liebel of the

6    Office of Children and Youth hired him, right?

7            MR. TAGGART:  The first time --

8            THE COURT:  Well, this is the second time?

9            MR. TAGGART:  The second time that was a result of a

10   Commission order.  Eventually the Commission ordered that.

11           THE COURT:  The Commission is the defendant here,

12   they're ordering him to be hired and you're suing the

13   Commission?

14           MR. TAGGART:  This only occurred after this gap that

15   we've been talking about where all these other people came in,

16   established seniority and he was not paid for that full period.

17           THE COURT:  Do you admit that at least facially this

18   doesn't make any sense; I mean, absent a motive, you don't have

19   it right now, you pled it, I'm not suggesting that, but what

20   was the impetus that changed the Commission's mind to hire him

21   in May rather than to put roadblocks in his hiring for the

22   previous four months?

23           MR. TAGGART:  The Commission, as a result of a

24   hearing that was held in Pittsburgh on all this, concluded that

25   his original hiring had been done improperly, he had been

12

1    treated as a per diem employee when he should have been brought

2    on as a full-time employee.  And to make up for that, they

3    ordered him to be hired.  In effect, washing away, from their

4    viewpoint, what had happened before and saying let's start off

5    on the right foot now.

6            THE COURT:  Is he still employed?

7            MR. TAGGART:  No, as part of the aforementioned

8    settlement, he was required to give up his employment with the

9    County of Erie.  However, when an individual is on one of these

10   lists --

11           THE COURT:  So he was hired, how long did he work

12   there when he was rehired?

13           MR. TAGGART:  Approximately four months.

14           THE COURT:  All right.  I'm going to ask you to sit

15   down and then I'm going to take up the substance of the motion,

16   then I'll hear from you.  All right, Ms. Lloyd.  Do you

17   understand this interplay between the Commission and the

18   County?

19           MS. LLOYD:  No.  I've been --

20           THE COURT:  Don't you think you should?

21           MS. LLOYD:  I've been attempting to understand that.

22   The Commission is just as confused, which leads to my confusion

23   because that's where my information comes from.  They were

24   quite surprised by the lawsuit.

25           THE COURT:  Well, I'm sure they were, someone has to

13

1    understand how this works.  And perhaps at some point you can

2    inquire of your client how it works.

3         MS. LLOYD:  I have inquired, I have basic

4    understanding of the two lists --

5         THE COURT:  Why would they have two lists, do you

6    know?

7         MS. LLOYD:  Well, the one list is the merit list

8    with the testing, that kind of thing.  The intern list, I'll

9    use the words that Mr. Taggart is using, that is there to

10   provide an opportunity for the younger, out of school intern

11   positions, and he is correct, there is an incentive for the

12   County monetarily.  They are not, from my understanding, they

13   are not permanent employees but can be --

14        THE COURT:  They can get a cheeper employee?

15        MS. LLOYD:  Yes, as probationary employees, they can

16   go from there.  It's also my understanding that the counties

17   that participate in getting this from the Commission, they are

18   not obligated to hire off of those lists to fill those

19   positions.  What they can do, if they request the list and they

20   fill that position at that time, it must be filled off that

21   list.  If they take the list and decide that none of the

22   candidates are suitable for them, they can leave the position

23   open and not fill it.  They can't go asking for applications

24   outside.

25        THE COURT:  On the merit list, if you will, the

1  regular list, we're only talking about that.  People are chosen

2  in order of their merit, is that right?

3           MS. LLOYD:  Yes, based on their test scores and that

4  could include Veteran's preference status and all those things

5  that are listed in the statute.

6           THE COURT:  Why isn't that other list, the "intern"

7  list, do an end run around the meritocracy of the other list?

8           MS. LLOYD:  It was my understanding from the

9  Commission that the individuals on that list did take the Civil

10  Service exam, that was my understanding.  And I need to be more

11  clear about that with my client.  I'm not sure -- they couldn't

12  really explain to me, they don't see it as an end run around,

13  is what I should say.  There are two viable lists for the

14  position and whether they want to make it a permanent,

15  full-time employee they pick off the merit list; and if they

16  want to go with an intern, I think it is a six-month

17  probationary status kind of thing, not permanent, then they go

18  off the other list.

19           THE COURT:  Well, probably as this goes on, this

20  will become clearer, I think.  But you have filed a partial

21  motion?

22           MS. LLOYD:  I filed the motion to try to (a),

23  understand this myself and (b), clean up the claims before we

24  start the discovery process.  I agree with Mr. Dows and the

25  Eleventh Amendment claim that yes, he is correct, that

1   individuals who in their official capacities can be held

2   responsible for injunctive relief, that is not what I was

3   trying to argue.  I was arguing that in a monetary sense --

4         THE COURT:  Isn't it true that when all is said and

5   done, you think the only claim that survives here is the Title

6   VII claim against the Commission?

7         MS. LLOYD:  That was my belief after reading the

8   amended complaint.  Now that I read the brief in opposition, we

9   now have magically appearing a Fourteenth Amendment procedural

10   substantive due process claim.

11         THE COURT:  Assuming that 1983 can't be used as a

12   vehicle to vindicate rights protected solely by Title VII, in

13   other words, the other way to put it is Title VII is

14   preemptive --

15         MS. LLOYD:  Correct.

16         THE COURT:  Of 1983, which I think is correct.  He

17   has now injected into the mix an equal protection claim?

18         MS. LLOYD:  Yes.

19         THE COURT:  Which arguably could be facially pled,

20   couldn't it?

21         MS. LLOYD:  Yes.

22         THE COURT:  It would not run afoul of the problem

23   that you were just talking about?

24         MS. LLOYD:  Had it been pled in the amended

25   complaint, your Honor, that wouldn't have been made part of my

16

1    motion to dismiss.

2         THE COURT:  So would it be fair to say, then, by

3    your lights, the only thing that should properly be left here

4    when all the smoke is cleared, is a Title VII claim against the

5    Commission; and arguably, a substantive due process equal

6    protection claim, not against individuals in their official

7    capacity, but against individuals in their individual capacity?

8         MS. LLOYD:  Well, I still have a problem with that

9    because part of my argument also was who did what.  He pleads

10   against Katherine Holtzinger Conner, the Chairman, but he

11   doesn't say how she was involved or how she did it or what her

12   role was, whether she had acknowledge, etc. --

13        THE COURT:  Then there's John Doe?

14        MS. LLOYD:  Then there's a John Doe, two or three or

15   however many now, they've multiplied.  There is still really

16   nothing in the complaint that tells me what that individual or

17   individuals may have done to even try to ascertain who those

18   people might be.

19        THE COURT:  Do you view this as a disparate impact

20   case --

21        MS. LLOYD:  If I had to guess where he was coming

22   from, which I did because he wasn't clear in the complaint,

23   that was my idea, it was a disparate impact --

24        THE COURT:  Which really doesn't require any mens

25   rea?

17

1          MS. LLOYD:  No.

2          THE COURT:  Just disparate impact?

3          MS. LLOYD:  Correct.  In a Title VII case, you're

4    right, your Honor.  But I didn't get that from the complaint,

5    either, I was guessing, just as you were, where this was going.

6    My hope was to kind of clean this up and understand before we

7    moved forward.

8          THE COURT:  We will.  All right, thank you.  All

9    right, let's see if we can see what we agree on or disagree on.

10   Let me just ask you some questions, then I'll let you jump in.

11   Do you agree that any of your 1983 claims against the

12   Commission, as an entity of the state, are barred under the

13   Eleventh Amendment?

14         MR. TAGGART:  Yes.

15         THE COURT:  So those are gone, number one.  Do you

16   agree that any of your claims against any of the state

17   officials acting in their official capacities are similarly

18   barred under the Eleventh Amendment, for money damages?

19         MR. TAGGART:  As to money damages, yes.

20         THE COURT:  Yes, I'm only talking about money

21   damages?

22         MR. TAGGART:  And in their official capacity.

23         THE COURT:  You also agree that the Commission is

24   immune from suit under the PHRA for money damages, as are the

25   individual defendants in their official capacity for money

18

1    damages for the same reason, the Eleventh Amendment?

2        MR. TAGGART:  Yes.

3        THE COURT:  Then that's gone.  Do you also agree, by

4    virtue of the Supreme Court decision in <u>Florida Board of</u>

5    <u>Regents</u>, that the ADEA claims against the Commission are barred

6    under the Eleventh Amendment as well -- because there's been no

7    waiver by the state?

8        MR. TAGGART:  Is that <u>Kimel v. Florida Board of</u>

9    <u>Regents</u>?

10        THE COURT:  Yes.

11        MR. TAGGART:  Yes, that's true.

12        THE COURT:  So that's gone.  Then do you agree that

13    there is no claim under Title VII, you can't bring a claim

14    under Title VII against an individual defendant under <u>Sheridan</u>?

15        MR. TAGGART:  That's correct.

16        THE COURT:  Then that's gone.

17        MR. TAGGART:  Title VII claims against the

18    Commission?

19        THE COURT:  Title VII claims against the

20    individuals.

21        THE COURT:  It can be against the Commission itself,

22    though?

23        MR. TAGGART:  Yes.

24        THE COURT:  I take it you agree with the principle

25    that where you have a Title VII claim, you can't transform it

1    into a 1983 claim to accomplish the same purposes as the Title

2    VII claim?  I'm not talking about equal protection now, I'm

3    talking about Title VII, you can't say that the constitutional

4    statutory right you're vindicating in a 1983 claim is a Title

5    VII claim?

6            MR. TAGGART:  I'll agree.

7            THE COURT:  It's preempted, you get everything under

8    Title VII?

9            MR. TAGGART:  Well, the whole issue of 1983

10   preemption -- Title VII, everything but its legislative history

11   shows that it should be considered preempted or preemptive of

12   1983 on the same subjects.

13           THE COURT:  Right.

14           MR. TAGGART:  But the courts in looking at it have

15   always had trouble getting passed that legislative history,

16   didn't seem to want that to happen.  But it seemed to want them

17   to co-exist, exist with the other.

18           THE COURT:  Whatever the merits of that may be, do

19   you agree that you can't piggyback a Title VII claim on the

20   back of a 1983 claim?

21           MR. TAGGART:  I agree that Title VII issues cannot

22   be the basis for the 1983 claim.

23           THE COURT:  Then that takes care of that.  Now, what

24   you have left then is a Title VII claim against the Commission.

25   And for the first time in your brief you say you are asserting

20

1   an equal protection claim under 1983 against -- once again,

2   this would have to be -- you're asserting an equal protection

3   claim against the individuals in their individual capacity?

4           MR. TAGGART:  Relative to 1983 that would be the

5   case.

6           THE COURT:  Tell me what the theory of the equal

7   protection claim is?

8           MR. TAGGART:  As to the protection, as opposed to

9   the activities of individuals -- this is the reason the

10  Chairman really should not be let out of the case at this

11  point.  What it boils down to is we know somewhat the

12  historical maintenance of these two lists.  Although, there are

13  immunities and privileges for people in that position, if the

14  individual is aware of these policies and their

15  classifications, that the effect was to rule out some groups

16  and rule in others and chose to maintain that knowingly.

17          THE COURT:  Then you could have the requisite level

18  of personal involvement?

19          MR. TAGGART:  Of even the Chairman for a 1983

20  action.

21          THE COURT:  Who are these John Does, do you have any

22  idea?

23          MR. TAGGART:  We know this much.  That there were

24  specific persons at the Civil Service Commission that discussed

25  Mr. Dows' situation with human resources people in the Erie

21

1    County government.  And it is our understanding advised them of

2    the procedures they could use to sideline him so he wouldn't be

3    available, when they were planning to hire this cohort of

4    people and move them in.  We don't know who that is.

5            THE COURT:  Let me ask you this.  At this stage is

6    it your theory primarily, with respect to the Title VII claim,

7    that primarily that the individuals, the John Does, the

8    Commission Chairman, were not personally motivated by gender

9    bias, but simply were passively complicit, if you will, in the

10   administration of a system which had the effect of producing a

11   disproportionate impact in favor of one group, as opposed to

12   the other?

13           MR. TAGGART:  That is probably the case potentially

14   for the chair and middle managers.  But I'm not ready to give

15   that away as to the individuals involved.  Because I want to

16   understand why they chose to give that advice.

17           THE COURT:  All right, is there anything else you

18   want to tell me?

19           MR. TAGGART:  No, your Honor.  If there are any

20   additional questions, I'd be delighted to answer those.

21           THE COURT:  I don't have anything else.

22           MR. TAGGART:  Thank you.

23           THE COURT:  Do you have anything else?

24           MS. LLOYD:  No, your Honor.

25           THE COURT:  Let's go off the record here.

22

1          (Discussion held off the record.)

2          THE COURT:  Actually, let's go back on the record.

3          MR. TAGGART:  An individual who is on one of these

4   merit lists, such as Mr. Dows, can be considered and referred

5   to more than one county.  Can change the county indicated with

6   the Commission.  And so Mr. Dows would hope to be hired in a

7   caseworker position of the same type, but in an adjoining

8   county, such as Crawford or perhaps Venango County.  But we're

9   now subject to this same issue no matter where we go.

10          THE COURT:  Isn't the big relief you're asking for,

11  that I enjoin the Commission from maintaining two lists?

12          MR. TAGGART:  Or merging them would achieve the same

13  thing.  In other words, if they became one unified merit list,

14  as was indicated by Ms. Lloyd, who has obviously done her best

15  to understand this to this point.  If, in fact, the younger

16  people take the same test and then it's all worked based on the

17  outcome of the test, that would, obviously, be acceptable and

18  fair.  Even if it didn't help us achieve --

19          THE COURT:  But you don't think the younger people

20  on the list -- you think on a meritocracy they would still fall

21  below your client and yet they were hired, is that right?

22          MR. TAGGART:  Yes.

23          THE COURT:  All right.  Now, let's go off the

24  record.

25          (Discussion held off the record.)

1          THE COURT:  All right, I'm going to get an order on

2    the record.

3                              ORDER

4          Presently pending before the court is the motion to

5    partially dismiss the amended complaint.  After oral argument

6    there have been various concessions made, as set forth on the

7    record, which I incorporate herein by reference.  Which,

8    essentially, reduces this claim now to a Title VII claim

9    against the Commission only.

10          In the plaintiff's brief in opposition, he raises

11   for the first time the fact that it is his intention, it was

12   his attention, rather, to attempt to plead an equal protection

13   claim against the individual defendants in their individual

14   capacity.  I'm of the opinion, at least for present purposes,

15   that was inadequately pled.  However, given the federal rules

16   of civil procedure's liberality, insofar as amendment is

17   concerned, I am going to grant leave to file an amended

18   complaint which, one, deletes from the complaint all of those

19   causes of action or theories concerning which you previously

20   conceded were non-viable.  And, two, pleads with the requisite

21   specificity the nature of your equal protection claim and the

22   individual or individuals you believe are responsible, and the

23   nature of their involvement.

24          And, finally, just let me say for the record,

25   insofar as prospective injunctive relief is concerned -- well,

24

1    when you are pleading, if it is your intention to seek

2    prospective injunctive relief, you may, of course, and this

3    would come in over no objection it's my understanding from the

4    state, it does not run afoul of the Eleventh Amendment,

5    delineate with some greater specificity exactly the nature of

6    the injunctive relief you are looking for and the entity or

7    entities from whom you are looking for.

8            So for the reasons set forth on the record, the

9    motion to partially dismiss the amended complaint is granted in

10   part and denied in part.  And the plaintiff is granted 20 days

11   within which to amend.  All right, is there anything unclear

12   about that?

13           MR. TAGGART:  No, your Honor, thank you.

14           THE COURT:  Anything further from you, Ms. Lloyd?

15           MS. LLOYD:  No, your Honor, thank you.

16           THE COURT:  Then the next thing we'll be getting,

17   presumably after the complaint we'll be getting an answer, and

18   then we'll get you back up here at some point for a status

19   conference.  All right, we're adjourned.

20

21           (Whereupon, at 2:03 p.m., the proceedings were

22   concluded.)

23

24                              - - -

25

1

# C E R T I F I C A T E

2

3

4

5     I, Ronald J. Bench, certify that the foregoing is a
6  correct transcript from the record of proceedings in the
7  above-entitled matter.

8

9

10

11

12

13  Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25