IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID A. DOWS , | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 04-341 Erie |
| | : | |
| KATHERINE E. HOLTZINGER | : | Judge McLaughlin |
| CONNER, ESQ., Chairman | : | |
| PENNSYLVANIA CIVIL SERVICE | : | |
| COMMISSION and JOHN DOE , | : | |
| Defendants | : | JURY TRIAL DEMANDED |

Part One, Deposition of J. Stephen Shartle, pages one through fifty

1                    IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                          - - -

4    DAVID A. DOWS,                        )
                                           )
5              Plaintiff,                  )
                                           ) Civil Action
6         vs.                              ) No. 04-341 ERIE
                                           )
7    PENNSYLVANIA CIVIL SERVICE            )
     COMMISSION and JOHN DOE,              )
8                                          )
               Defendants.                 )
9
                               - - -

10
                  Deposition of J. STEPHEN SHARTLE
11
                  Wednesday, December 21, 2005
12
                               - - -
13
          The deposition of J. STEPHEN SHARTLE,, called as
14   a witness by the plaintiff, pursuant to notice and the
     Federal Rules of Civil Procedure pertaining to the
15   taking of depositions, taken before me, the
     undersigned, Eugene C. Forcier, Stenographer
16   Commissioner in and for the Commonwealth of
     Pennsylvania, at the Office of the Attorney General,
17   Commonwealth of Pennsylvania, Litigation Section,
     Strawberry Square, Harrisburg, Pennsylvania  17120,
18   commencing at 9:33 o'clock a.m., the day and date
     above set forth.
19
                               - - -
20
                  COMPUTER-AIDED TRANSCRIPTION BY
21               MORSE, GANTVERG & HODGE, INC.
                      ERIE, PENNSYLVANIA
22                     814-454-6655

23                          - - -

24

25


ORIGINAL

1  APPEARANCES:

2        On behalf of the Plaintiff:

3            William Taggert, Esquire
             1400 Renaissance Centre
4            1001 State Street
             Erie, Pennsylvania  16501
5
         On behalf of the Defendant:
6
             Linda S. Lloyd, Senior Deputy Attorney
7              General
             Office of the Attorney General
8            Litigation Section
             Strawberry Square
9            Harrisburg, Pennsylvania  17120

10           Frederick C. Smith, Jr., Chief Counsel
             State Civil Service Commission
11           Legal Services Office
             320 Market Street, 4th Floor
12           Harrisburg, Pennsylvania  17108

13                          - - -

14  ALSO PRESENT:

15        David A. Dows

16                          - - -

17

18

19

20

21

22

23

24

25

```
 1                        J. STEPHEN SHARTLE
 2    called as a witness by the plaintiff, having been
 3    first duly sworn, as hereinafter certified, was
 4    deposed and said as follows:
 5                        EXAMINATION
 6    BY MR. TAGGERT:
 7         Q      Good morning, sir.
 8         A      Good morning.
 9         Q      And just before we began today, you were
10    sworn; is that correct?
11         A      That is correct.
12         Q      And for the record, would you state your
13    full name?
14         A      My full name is J. Stephen Shartle.
15         Q      And what is your current position with the
16    Civil Service Commission?
17         A      I am the director of the Bureau of
18    Technical and Information Services.
19         Q      And where is your office located?
20         A      It is in Strawberry Square building, in
21    Harrisburg, Pennsylvania.
22         Q      Now, sir, today we are in a deposition
23    related to a lawsuit filed by my client, David Dows,
24    having to do with the civil service and the
25    maintaining of both merit lists and intern lists.
```

```
 1              And, we are mostly just trying to
 2   understand how this all came to be.
 3              And I promise you, and you have two
 4   attorneys here today, there are no tricks, and we are
 5   just trying to understand how this all evolved.
 6              And then how it runs in real life.
 7              And, all decisions are made by Judge
 8   McLaughlin, who is going to out rank of any of us.
 9              Now, today, if at any time you don't
10   understand a question, don't answer it.  Just tell me,
11   you know, what about the question we need to work
12   with, and I will work with you on it, until we are all
13   agreed that it is understandable, and then give your
14   best answer.
15              If you need to consult counsel today --
16              MR. TAGGERT:  Would that be you,
17         Miss Linda?
18              MS. LlOYD:  Yes.
19              MR. TAGGERT:  Miss Lloyd.  Yes, very
20         southern, Miss Linda.
21              Okay.  We have been talking so much, we
22         have been e-mailing so much, we are at the Linda
23         and Bill e-mail show.
24         Q    Now, would you take us through, from
25   beginning to now, your career and positions with the
```

1  Civil Service Commission?

2      A      Sure.

3              I started with the Civil Service

4  Commission, in -- I am trying to get the year right

5  here -- I guess it was 1974, I think it was '74.

6              And I was a clerk 2, working in the mail

7  room of the state Civil Service Commission.

8              Some of these dates may be slightly off,

9  because it's been 30 years.

10     Q      That's understandable.  Just do the best

11  you can.

12     A      Yeah.

13             I think it was in around September of 1975,

14  I was promoted to an administrative assistant job in

15  what was then the Bureau of Documents Control,

16  responsible for issuing civil service certifications.

17     Q      What came next?

18     A      In 1977 I was appointed as a government

19  career trainee, in the -- what was then called the

20  Technical Assistance and Investigation Division.

21     Q      Now, did I take it right, that you said

22  trainee, or trainer?

23     A      Trainee.

24     Q      And what did that involve; what were your

25  duties in that job description?

1      A      That job involved learning how to conduct
2  training sessions, learning how to investigate
3  complaints, or allegations of misdoings by applicants,
4  or eligibles, or current employees.

5             Learning about conducting technical
6  assistance reviews of personnel offices, where we
7  would look at all of their personnel functions, to see
8  if they were in compliance with civil service, and
9  writing of management directives.

10     Q      And you in fact had done all of those
11  things, while you were in that position?

12     A      I was learning how to do those things, when
13  I was in that position.

14     Q      And what came next?

15     A      At the end of the training, which was a
16  one-year training period, I was promoted to personnel
17  analyst 1.

18     Q      And at that time, what were the duties of
19  personnel analyst 1?

20     A      They were the same as the duties of the
21  trainee, except now I was actually doing them, I
22  wasn't learning how to do them.

23     Q      And how long did you stay in the position?

24     A      I was in that actual job classification for
25  about another year or two, and then I got promoted to

1  a personnel analyst 2, which was doing the same

2  duties, but more independently.

3      Q      And were you confined to a geographic area,

4  or did you investigate all over the state?

5      A      It was the entire Commonwealth.

6      Q      What was your next job with the Commission?

7      A      Sometime around 1979 or 1980, we had a

8  reorganization, and the investigative function was

9  taken out from within the division that I worked in.

10          About a year after that, an audit function

11  was added to the job.  That audit function basically

12  involved reviewing personnel transactions of state

13  employees, and local government employees, to ensure

14  that those transactions complied with civil service

15  regulations, and also auditing civil service

16  certifications, to ensure that the appointments were

17  within the Rule of 3 and veterans preference.

18      Q      And for the clarity of the record, later,

19  when people read this, would you describe the

20  Rule of 3?

21      A      The Rule of 3 basically is that on a civil

22  service list, any one of the top three available

23  candidates can be selected.

24          What happens is, sometimes on a

25  certification, some people aren't available, so we

 1  ensure they make the appointment out of the top three.
 2      Q      And in choosing among the top 3, is the
 3  choosing individual or authority confined to any
 4  particular set of standards; are they free to choose
 5  completely freely, among the top three?
 6      A      The Rule of 3 itself, in the civil service
 7  regulations, allows to appoint any one of the three.
 8      Q      As applied, are there restrictions; for
 9  instance, the avoidance of discrimination is
10  considered illegal?
11      A      Any time there is a selection, but we don't
12  necessarily audit for that.
13      Q      So is it the understanding that the
14  Commission, that an authority is still limited by the
15  other -- well, by the various discrimination laws that
16  apply to hiring?
17      A      Absolutely.
18      Q      So that even choosing among the top three,
19  the Commission assumes that the authority hiring is
20  acting in good faith, and not using improper standards
21  to choose among the three?
22      A      Right.  Correct.
23      Q      And again, for the record, would you
24  describe how veterans preference works, in civil
25  service hiring?

```
 1      A       Veterans preference is actually part of the
 2  Commonwealth's Military Code.
 3              Not really part of the Civil Service Act.
 4              But how we apply it, it's three-fold.
 5              One is that a veteran gets ten points added
 6  to their final earned rating, or their score, if they
 7  pass the test.
 8      Q       So the ten points can't be used to cause
 9  you to pass the test?
10      A       Exactly.
11      Q       Okay.
12      A       It's in addition to passing the test.
13              The second part of that is, if a veteran is
14  in the Rule of 3, then the veteran gets preference,
15  and a nonveteran cannot be selected.
16      Q       And are there any other aspects of the
17  veterans preference?
18      A       The third aspect of that is the veteran
19  does not have to be in the Rule of 3 in order to be
20  selected, the veteran can be selected regardless of
21  their final earned rating or score.
22      Q       Would you explain how that works in
23  practice?
24      A       When we send a list to an agency, the
25  agency has a vacancy, they will ask for a civil
```

1  service list, which we call a certification.

2          That certification indicates the eligibles

3  on the list who are veterans, and the agency contacts

4  the eligibles on the list, determines the Rule of 3,

5  and based on that determination, applies veterans

6  preference regulations, if there is a veteran who can

7  be appointed.

8     Q     What was your next position at the

9  Commission?

10    A     The next position was probably around 1980,

11  we had another reorganization, and we -- the division

12  that I worked in took over some additional functions,

13  with audits, some additional audit functions, some

14  more computerized things that we were doing, and I was

15  put in charge of a unit within the division, and I was

16  promoted to human resource analyst 3 -- I'm sorry, at

17  that time it was a personnel analyst 3.

18    Q     And what were your job duties, as a

19  personnel analyst 3?

20    A     Very similar to what I did previously, with

21  a couple of different functions.

22          Supervising -- some of these concepts are

23  hard to understand, you understand -- when an agency

24  processes an action, what we call a change sheet, what

25  was produced, a hard copy indicating that this is what

1  the computer updates were.

2          And I assumed responsibility for

3  supervising the staff that reviewed those, and some

4  other internal audit functions that we did.

5      Q    And this activity involved both  monitoring

6  state agencies, and also other governmental units?

7      A    That is correct.

8      Q    What was your subsequent position with the

9  Commission?

10     A    Around 1985 I was promoted to the division

11 chief of Technical Assistance and Audit, which was a

12 personnel analyst 4 job.

13         Again, many of the same functions, not

14 totally all of the investigations, but I became

15 responsible for investigations in many cases,

16 involving nonselection type of complaints.

17     Q    Yes.

18     A    In addition to all of the other functions

19 we described previously.

20     Q    How long did that remain your job?

21     A    Until March of this year, I was assigned to

22 temporarily work out of class as the bureau director.

23         And, in July of this year, I was promoted

24 into the position.

25     Q    So at first you were, in effect, the acting

1  bureau director?

2      A      Acting bureau director.

3      Q      And now it is a permanent position?

4      A      Hopefully, yes.

5      Q      To the extent anything in life is

6  permanent.

7      A      Yes.

8      Q      And in preparing for today's deposition,

9  are there any materials that you have reviewed for

10 today?

11     A      I did not review anything.

12     Q      Now, in your work with the Commission over

13 the years, at some point did you become familiar with

14 the concept of trainee classes?

15     A      Yes.

16     Q      And do you know the origins of there being

17 trainee classes, and the list being handled by the

18 Civil Service Commission?

19     A      No, I do not.

20     Q      In your experience, as the years went by,

21 when did you first become aware of the existence of

22 trainee classes?

23     A      Probably when I first was employed with the

24 Technical Assistance Unit, which would have been like

25 back in 1975 or so.

```
 1      Q     So, would you say it's accurate that at
 2  least by 1975, the Civil Service Commission had
 3  dealings with some trainee class situations?
 4      A     Yes.
 5      Q     And, are these classes created by the Civil
 6  Service Commission, or did they have their origin
 7  somewhere else in the state government?
 8      A     They have their origin somewhere else.
 9      Q     And I am not trying to be coy, did these
10  come out of the Governor's Office?
11      A     Yes, they did.
12      Q     And I am going to mark as our first
13  exhibit, what is entitled "Management Directive.
14  535.5 Amended," dated September 12th, 1996.
15            And this will be our Deposition 1.
16            (Thereupon, Deposition Exhibit No. 1 was
17       marked for identification.)
18  BY MR. TAGGERT:
19      Q     Please feel free to take a moment with that
20  and refresh your memory, and orient yourself as to
21  what it is?
22      A     I'm familiar with this directive.
23      Q     Now, the directive has six pages.
24      A     Uh-huh.
25      Q     And I apologize, the directive is three
```

 1  pages, and the list of classes is six pages.

 2             And, there are many different types of jobs

 3  listed.

 4        A    Yes.

 5        Q    Are some of these empty categories; in

 6  other words, they are not actively being used as ways

 7  of putting people in jobs, either because it never

 8  happened, or they are obsolete now, and they have gone

 9  away?

10        A    Yes.

11        Q    How does -- based on all you know, how does

12  a particular class come to be developed, and then wind

13  up in the list of classes?

14        A    I don't know how they are developed,

15  because that is done in a different agency.

16        Q    And is that agency always the Governor's

17  Office, as we mentioned before; or can they come from

18  multiple agencies?

19        A    At the time that this list was produced,

20  all of them came from the Governor's Office,

21  Administration.

22        Q    Did that change later?

23        A    Yes.

24        Q    And where can these classes come from now?

25             In addition to the Governor's Office?

1    A    The local government classes can come from

2  a committee of Commonwealth funding agencies, the

3  agencies that fund the local government agencies.

4    Q    And so would it be right, that a class can

5  be agreed upon by one of these committees of funding

6  agencies?

7    A    That's correct.

8    Q    So -- and at that stage, the Civil Service

9  Commission might not even be aware that a class of

10 that type is being contemplated; it's being worked out

11 by this committee of agencies; is that right?

12   A    We sit on the committee.

13   Q    So any one of these committees would have a

14 representative from the Civil Service Commission?

15   A    That's correct.

16   Q    And would different people from the

17 Commission sit on different committees?

18   A    No, it's just one committee.

19   Q    So it is one unified committee.   For

20 shorthand, does it have a name?

21   A    No, it really doesn't.  We just call it the

22 classification committee.  I guess that's what its

23 name is, I don't really --

24   Q    At least if you used that term around the

25 Civil Service Commission, people would know what you

1   were talking about?

2       A       In some parts of the Civil Service

3   Commission, they would know.

4       Q       And, currently, do you sit on that

5   committee?

6       A       I periodically attend their sessions, but I

7   am not a regular committee member.

8       Q       At any time, were you a formal member of

9   the committee?

10      A       Yes.  Yes.

11      Q       And is there currently a designated person,

12  who is the official representative of the Commission

13  on the committee?

14      A       Yes.

15      Q       Who is that person?

16      A       Marie Thau.

17      Q       And what are the functions of the civil

18  service representative on the committee?  Why don't I

19  break that into parts.

20              One, why does the Commission choose to have

21  a representative on that committee?

22      A       We do that, so we can coordinate -- I

23  should add, frequently one of our test development

24  people will sit on the committee, too, not all the

25  time, but sometimes, depending on what the job is.

1             We want to ensure that whatever classes are
2    developed, that the Civil Service Commission is in
3    agreement with that class, that we are in agreement
4    with the qualifications, and that we can test for that
5    particular class.
6        Q     So would it be correct that the Commission
7    has input as to the definition of the class?
8        A     The classes that are being developed,
9    yes.  Yes.
10       Q     And the Commission works with -- the Civil
11   Service Commission works with the committee to try to
12   develop what is deemed the appropriate test for that
13   activity?
14       A     No, our test development people develop the
15   test.
16       Q     Is there any input from the agencies, to
17   your people, as to -- in developing the test?
18       A     I don't know that for sure.
19       Q     Beginning on pages 1 through 6, in the list
20   of classes --
21       A     Uh-huh.
22       Q     -- did you have direct professional
23   experience, in developing either the definition of the
24   class, or the test for the class, with any of these
25   classes that are listed?

```
 1      A      By "definition", what do you mean, sir?
 2      Q      In other words, each class -- I assume
 3 under each class title, in addition to the title
 4 itself, there is some sort of definition, who fits in
 5 that class, or what activity the person will carry on?
 6      A      Okay.  Yeah.
 7      Q      Is that correct?
 8             In this list, and take your time, because
 9 there are a lot of class titles, have you worked
10 personally with the development of any, either the
11 definition of the classes, or the examinations for any
12 of these classes?
13      A      No, I haven't.
14      Q      And do some of these classes even predate
15 you?
16      A      Yes, they do.
17      Q      And then over the years, the group of
18 classes has grown, and they are added as the committee
19 decides various classes are needed?
20      A      I don't know that it's grown, because a lot
21 of classes have also been eliminated.
22             So I don't know if the total is greater or
23 lesser than what it was 30 years ago.
24      Q      And sometimes do they merge into --
25      A      Sometimes that can happen, yes, sir.
```

 1    Q    Now, what we have just been talking about,
 2  does that only apply to state agencies coming to you,
 3  or how do county agencies have any input about class
 4  titles?

 5    A    I don't have direct contact with county
 6  agencies, as far as job titles, other than city and
 7  county housing authorities.

 8    Q    Do other people, in your agency, have
 9  direct contact with county agencies, over the
10  development of class titles, or testing?

11    A    No, we do not.

12    Q    So that's really taken care of at the state
13  level, by the committee that you were talking about
14  earlier?

15    A    It's taken by the state agency that funds
16  that county program.

17    Q    Do you know which state agency is
18  responsible for the funding that flows to county
19  Offices of Children and Youth?

20    A    Yes, that would be the Department of Public
21  Welfare.

22    Q    And so does a DPW representative sit on the
23  committee that we have been talking about?

24    A    Yes, they do.

25    Q    Now, on page 5 of the six page list, there

1   is a designation class code L0618?

2         A      Yes.

3         Q      County social casework intern.

4                Would that class have been developed by the

5   committee, decided upon by the committee?

6         A      Not to my knowledge.

7         Q      Do you know how this particular class came

8   to exist?

9         A      To my knowledge, it was something that the

10  Governor's Office of Administration coordinated with

11  whichever funding agency requested this class.

12        Q      Do you know, would that funding agency have

13  been DPW?

14        A      It could have been DPW, it could have been

15  a Department of Aging, since both of them use it.

16        Q      Now, no matter who created the class, would

17  the Commission have created whatever testing

18  instrument was prepared to rank people in the class?

19        A      As -- you mean as a result of the testing?

20        Q      Yes.

21        A      Yes.

22        Q      And we are talking now about county social

23  casework intern?

24        A      Yes, we would have developed the

25  examination program.

1    Q    Did you have any involvement with the

2  development of the test instrument that's used for

3  that particular class?

4    A    I did not.

5    Q    Do you know who did?

6    A    I do not.

7    Q    Which department in the Commission would

8  have been responsible for creating --

9    A    It would have been our Bureau of Personnel

10  Assessment.

11    Q    Now, do you have some familiarity with the

12  requirements applied through the Commission, for

13  county social casework intern?

14    A    I have some limited knowledge of it, yes.

15    Q    Okay.  So, you know, if we bump up, or go

16  over those edges, tell us.

17    A    Yes, sir.

18    Q    My highly limited understanding is that

19  there is, oh, a questionnaire that the interns are

20  asked to fill out in order to be on that list; is that

21  a fair statement?

22    A    I don't know that for certain.

23    Q    If you know, is there an actual graded test

24  that people take, for county social casework intern?

25    A    I don't know.

1    Q    Now, are you also familiar with a category

2  of county caseworker?

3    A    Yes.

4    Q    And do you have any knowledge of the

5  creation of that class title?

6    A    I'm not sure I understand the question,

7  exactly.

8         But I know that that class title exists.

9    Q    Have you ever had -- prior to any dealings

10  with Mr. Dows, did you ever have occasion to work with

11  any cases, complaints, developments, exams, anything

12  having to do with county caseworker 2 positions?

13    A    Ever.

14    Q    It's a big word, yes.

15         That you recall, obviously.  As you said,

16  you have been with the commission many years.

17    A    In probably around 1977, myself, and a

18  representative from our test development unit, and the

19  Governor's Office, and the Department of Public

20  Welfare, and -- I'm not even sure if the Department of

21  Aging existed then, I don't think it did -- the

22  agencies that had local government employees, met to

23  designate these class code things, that you see, the

24  L0618, the L0624.

25    Q    And so forth, down through that?

1       A       And so forth, to establish basically a

2  local government classification plan.

3               So, we did do that.

4               I was involved at that point.

5               Sometime subsequent to that, probably, oh,

6  mid '80's, '84 or so, you know, I could really be off

7  on that date, I was on a committee that broke out the

8  caseworker class, the county caseworker class, into

9  the aging care manager and a drug and alcohol class

10  called drug and alcohol case management specialist.

11              So up until that point, caseworkers for all

12  three agencies were called caseworkers.

13              We broke those out into three different

14  categories.

15      Q       One would be the drug and alcohol

16  counselors?

17      A       It is called the drug and alcohol case

18  management specialist.

19      Q       And then there would be one for the aging?

20      A       Which is the aging care manager, which is

21  one of the classes listed there.

22      Q       And then there would be --

23      A       The county caseworker.

24      Q       -- the county caseworkers.

25              Now, would it be correct that the casework

1   intern can move into the position of being a county

2   caseworker; that that tracks into becoming a county

3   caseworker, if one successfully serves the internship,

4   and the county chooses to keep the person?

5        A      Yes, it can.

6        Q      With the caseworker positions, both intern

7   and county caseworker, are you aware of any analysis

8   done of the population of people who become interns,

9   and then caseworkers, as to their age or gender?

10       A      I am not privy to any such information.

11       Q      So you are not aware, within the

12  Commission, of there being a gender or age analysis of

13  the people moving into the internship position, or

14  into the county caseworker position; is that right?

15       A      I am not aware of any such documents,

16  information.

17       Q      Okay.

18              MR. TAGGERT:  Off the record.

19              (Discussion off the record.)

20              (Thereupon, Deposition Exhibit No. 2 was

21       marked for identification.)

22  BY MR. TAGGERT:

23       Q      Sir, if you would take a moment with No. 2.

24              Would you tell us what that is?

25       A      This is a notice of exam results.

1     Q     And is it for Mr. Dows; does it relate to
2  Mr. Dows?

3     A     The name on the notice is D.A. Dows.

4     Q     And this references a particular position.
5  What position is that?

6     A     These are examination results for the drug
7  and alcohol case management specialist trainee, drug
8  and alcohol case management specialist, and drug and
9  alcohol case management supervisor.

10    Q     And would it be correct, that based on the
11  notations on the right-hand side, Mr. Dows placed at
12  the top of that particular examination?  And I am
13  referring to the column that says "Higher Than You,"
14  and the filled in is zero.

15    A     I'm not sure I understand the question,
16  now.

17    Q     Okay.  Would it be correct, that relative
18  to the exam in question, the test results showed that
19  Mr. Dows was the highest ranking individual?

20    A     That is true, except for the drug and
21  alcohol case management supervisor.

22    Q     And under that category, we see, is that
23  Z as in zebra 03?

24    A     That is correct.

25    Q     And then under "Comment," it says, "You do

 1  not have the required experience."

 2              Does the Commission, before someone sits

 3  for the exam, decide whether an individual has the

 4  experience to sit for the exam, or look at it

 5  afterwards, once the test results are in?

 6       A    Either one could happen.

 7       Q    And in the opinion -- if in the opinion of

 8  the Commission, an individual does not have the

 9  necessary experience, does the Commission ask someone

10  to not sit for the exam?

11       A    If that evaluation is done ahead of time,

12  yes.

13       Q    But there is no significance, as far as you

14  know, to detecting it before or after taking the exam?

15              In other words, that's just the luck of the

16  draw, sometimes it happens one way, sometimes it

17  happens the other?

18       A    No.

19              It's --

20       Q    Or it only becomes relevant if the person

21  does well on the exam, and then somebody looks at the

22  underlying experience?

23       A    It's not done by happenstance, so to speak.

24  It is done because a person may request to have their

25  application evaluated before they take the test.

```
 1     Q     Oh, I see.

 2     A     But it's not a random thing.

 3     Q     And then if one doesn't make that request,

 4  but scores well on the exam, then a Civil Service

 5  Commission employee would look to determine if the

 6  individual had the required experience?

 7     A     That is correct.

 8     Q     Are the actual examinations are graded by

 9  Civil Service Commission's employees?

10     A     Yes.

11     Q     So it's always in-house?

12     A     That is correct.

13     Q     And the counties themselves don't have any

14  input on the grading of examinations; is that right?

15     A     I don't know that for a fact.

16     Q     In your experience, have you known the

17  counties to have any part in the grading of the civil

18  service exams?

19     A     The question is rather broad, and difficult

20  to answer.

21     Q     Right.  How may I --

22     A     Because --

23     Q     How may I help you, how may I narrow it?

24     A     Well, with exams, our test development

25  people do deal sometimes with the agencies, not to
```

```
 1   actually score the examination paper, but to determine
 2   what good questions there are, what is the most
 3   appropriate answer, and that sort of thing.
 4            I don't know if they have done that with
 5   local government agencies or not.
 6       Q    So, would it be fair to say, that perhaps
 7   counties play some part in the development of some
 8   examination questions?
 9       A    Yes.
10       Q    But, the counties play no part in the
11   actual grading of exams?
12       A    Correct.
13            (Thereupon, Deposition Exhibit No. 3 was
14       marked for identification.)
15   BY MR. TAGGERT:
16       Q    Sir, I ask you if you would take a look at
17   Deposition Exhibit 3.
18            And would you tell us what Exhibit 3 is;
19   would you identify that for us?
20       A    Notice of examination results.
21       Q    And that's again for Mr. Dows; is that
22   correct?
23       A    That is correct.
24       Q    And for which job titles?
25       A    County case worker 1 (local government),
```

 1  county caseworker 2 (local government) and county

 2  caseworker 3 (local government).

 3      Q      And as you understand it, from looking at

 4  Exhibit 3, where did Mr. Dows rank in that testing?

 5      A      For the county caseworker 1, he ranked

 6  No. 1.

 7             For the county caseworker No. 2, and the

 8  county caseworker 3, he was not eligible.

 9      Q      And does the document say why Mr. Dows was

10  not considered eligible?

11      A      It says, "You do not have the required

12  experience."

13      Q      And so that is similar to that notation in

14  Exhibit 2; correct?

15      A      Correct.

16      Q      Do you know, from any of your dealings with

17  Mr. Dows, or investigating a case about him, as was

18  discussed earlier this morning, what was meant by

19  missing requirements; do you know what requirement or

20  requirements he didn't meet?

21      A      I do not know.

22      Q      Would it refresh your memory, that the

23  absent requirements might have been a time of -- an

24  amount of time he had worked in a related activity,

25  social work kind of activity?

1     A     That, no, I -- I don't recall.

2     Q     Now, as to caseworker interns, do you know

3 when an individual is a caseworker intern, is he or

4 she being paid out of the local county's budget, or is

5 there money being received from the state to pay for

6 the interns, the caseworker interns?

7     A     I don't know.

8     Q     Now, is that something -- for Office of

9 Children and Youth interns, is that something that

10 would be known to someone within the Department of

11 Public Welfare?

12    A     I don't know.

13    Q     Is it your understanding that some state

14 funds flow -- based on an earlier question today, some

15 state funds flow from DPW to county Offices of

16 Children and Youth?

17    A     My understanding is that there are funds

18 that flow from DPW to local government.  Whether they

19 are federal funds, or state funds, I am not aware.

20    Q     All right.

21          But, though we don't know whether they are

22 state or federal in their source, they, these funds,

23 some funds move through the Department of Public

24 Welfare to these county OCY organizations; correct?

25    A     Correct.

1    Q    Now, what is the process for an individual
2  to become a county social -- or attempt to become a
3  county social casework intern?  What does an
4  individual do?

5    A    The only part of the program that I am
6  familiar with, is the fact that they have to take a
7  civil service exam, whatever that exam is, and be in
8  the Rule of 3.

9    Q    Within the Commission, which persons would
10  you think would be knowledgeable on that trainee
11  subject, what people have to do to become a county
12  social caseworker intern?

13    A    I would think that somebody in our Bureau
14  of Employment Services, but I don't know which
15  individual is the coordinator, or the expert on that
16  particular class.

17    Q    Would Mr. DelToro be someone who would be
18  familiar with those issues?

19    A    Possible.

20    Q    And the same thing as to Marie Thau?

21    A    Marie, I can't speak for her, but she works
22  with me, and we don't get involved in those kind of
23  things.

24        I would assume not, but I don't know.

25    Q    At the Commission, did you know a

1  Mr. Benitaz, B-e-n-i-t-a-z?

2         Is that name familiar to you?

3     A    Mr. Benitaz?

4     Q    Is that name familiar?

5     A    No, it is not.

6     Q    Do you know if an individual applies to be

7  a caseworker, county caseworker, does he or she have

8  to choose for a particular county, like a county for

9  which he or she is applying?

10    A    Yes.

11    Q    And is an individual allowed to apply for

12 more than one county?

13    A    Yes, they are.

14    Q    Do you know how many, at a time?

15    A    The limit is, I believe, ten.  I'm not

16 positive about that, but I think it's ten.

17    Q    There is some limit?

18    A    There is a limit.

19    Q    Did there come a time when you were

20 contacted by David Dows, the man who is here with me,

21 regarding employment in Erie County, Pennsylvania, and

22 it had to do with his attempting to be a county

23 caseworker with the Erie County Government?

24    A    I can't recall receiving anything from

25 Mr. Dows on that particular subject.

 1      Q     What's your first contact, that you recall,
 2  with Mr. Dows, or about Mr. Dows?
 3      A     The Commission had received a letter from
 4  Mr. Dows, as I recall, requesting some age and gender
 5  information from a civil service certification.
 6      Q     And was that request sent to you for
 7  analysis, or response?
 8      A     It was sent to me by our Executive Office,
 9  yes.
10      Q     And what steps did you take, once you
11  received it?
12      A     I contacted Mr. Dows by telephone.
13      Q     And would you tell us about your telephone
14  conversation with him?
15      A     Well, I wanted to explain to him that I
16  could not give him age and gender breakdown for each
17  candidate on the list, that I would not do that, but
18  we could give him counts, how many females were on the
19  list, how many males, and what the general age ranges
20  were.
21      Q     And what did you mean by general age range;
22  by decades, or --
23      A     Yeah, by decades.
24            How many people were on the list in their
25  20's, how many were in their 30's, how many were in

```
 1  their 40's, et cetera.

 2       Q     And so forth?

 3       A     Yes.

 4       Q     And as you recall, did you provide that

 5  data to Mr. Dows?

 6       A     Yes, we did.

 7       Q     And at some point did you learn that

 8  Mr. Dows had been appointed as a per diem caseworker,

 9  by the Office of Children and Youth?

10       A     That same conversation, I found that out,

11  yes.

12       Q     And the employer in that instance would

13  have been OCY in Erie County, Pennsylvania?

14       A     That is correct.

15       Q     Did you have any concerns that there had

16  been a per diem hire of Mr. Dows?

17       A     Yes.

18       Q     And what were those concerns?

19       A     I -- I looked in our records for Mr. Dows'

20  employment history, I could not find that we had any

21  record of him working at the Erie County Children and

22  Youth.

23       Q     Now, for the sake of the record, keep it

24  rounded out, when an individual is hired, who is in a

25  position covered by the civil service, you know,
```

 1  people loosely call a civil service job, is the hiring
 2  county supposed to notify your agency?
 3      A      The hiring county, yes, are supposed to
 4  notify us.
 5      Q      And do they have a particular amount of
 6  time in which they are supposed to do that?
 7      A      Within five days of the appointment, five
 8  working days of the appointment.
 9      Q      And when you checked your records, there
10  was no record of Mr. Dows having been hired by the
11  county, for that purpose?
12      A      That is correct.
13      Q      Now, was there -- was there a per diem
14  category that was governed by this civil service, in
15  some way?
16      A      We don't use the term "per diem".
17      Q      Is there a term that you use, that means
18  essentially the same thing?
19      A      I'm not really sure what Erie County meant
20  by per diem.  To me, per diem means something totally
21  different than what they were -- what they seemed to
22  be using it as.
23      Q      As you saw it, what did you take, in your
24  professional experience, the term "per diem" to mean?
25      A      As far as Erie was concerned?

1    Q    Your general understanding, before you
2    encountered this area?
3    A    Per diem had to do with pay, with when you
4    are on the road, when you are traveling, pay that you
5    get for your expenses.
6    Q    So really, expenses for being away from
7    your duty station?
8    A    Away from your duty station.
9    Q    And are there day by day jobs, in that
10   sense of per diem, that are covered by civil service;
11   does civil service really have anything to do with
12   hiring people just for brief periods of time?
13   A    Yes.
14   Q    And can that apply to any of the job
15   categories?
16   A    Yes, it can.
17   Q    When you learned about the per diem hiring
18   of Mr. Dows, the allegation that it had occurred, did
19   you make any investigation?
20   A    Yes.
21   Q    And what did you do?
22   A    First thing I did, was contact Erie County
23   Children and Youth, to ask about the information that
24   I had received for Mr. Dows.
25   Q    And what did you learn?

1    A    Their human resource person advised me that

2  he had been hired as a per diem employee, without

3  benefit of the civil service certification.

4    Q    And did you have any concerns about his

5  having been hired in that way?

6    A    Yes, we did.

7    Q    What were those professional concerns?

8    A    That there was a possibility that his

9  selection was a violation of the civil service

10  regulation.

11    Q    Did you ask the county to provide

12  additional data, or information to you, as part of

13  your investigation, at that point?

14    A    I don't recall if I did at that point.

15    Q    What was your next step in the

16  investigation?

17    A    So much happened around the same time, a

18  lot of things.

19    Q    Yes.

20    A    A couple of things happened, not

21  necessarily in this order:

22         I had learned from talking to their human

23  resource office, about some other things that were

24  potential problems.

25         We -- I had my staff review some

 1   documentation, previous certifications, that were

 2   issued to Erie County Children and Youth, and I

 3   discussed with my supervisor the possibility of doing

 4   an onsite investigation.

 5        Q     Who was your supervisor at that time?

 6        A     Aubrey Watkins.

 7        Q     And what did you and Mr. Watkins decide

 8   about an investigation?

 9        A     We decided that an investigation would be

10   appropriate in this case.

11        Q     And so the Commission then began its own

12   investigation?

13        A     That's correct.

14        Q     And were you the prime investigator?

15        A     Yes, sir.

16        Q     What were the main points that you learned

17   in your investigation?

18        A     We -- we -- we learned that Erie County

19   Children and Youth had been appointing employees in

20   the civil service jobs, without civil service

21   knowledge.

22              We learned that they had been promoting

23   people, within the organization, without civil service

24   knowledge.

25              There were actually about 20 different

 1  issues that we had problems with, and I just don't

 2  recall what they all were.  But they were basically

 3  focused around taking actions with appointments, and

 4  movement of civil service employees, without advising

 5  the Civil Service Commission of what they had done.

 6      Q      And were a number of these movements of

 7  people in OCY?

 8      A      It was only OCY.

 9      Q      So that particular investigation was

10  confined to that agency?

11      A      That is correct.

12      Q      Was your contact person, in human

13  resources, Patrice Berchtold?

14      A      Yes, it was.

15      Q      And did Miss Berchtold offer an explanation

16  as to why the county had not been informing the

17  Commission of these personnel changes?

18      A      There were explanations, yes.  Yes, they

19  gave explanations.

20             I'm sorry, I had to think about what was

21  going on there.

22      Q      And what were her explanations?

23      A      For the, what she called per diem

24  employees, which were employees hired, brand new

25  appointments, without telling us, it was that they

1   wanted to give them a trial employment period, before

2   they determined whether they wanted to keep them on a

3   permanent basis, and hire them off the civil service

4   list.

5           For the promoted employees, they were

6   waiting to tell us until after the employee -- let me

7   backtrack a little bit.

8           According to them, under their collective

9   bargaining contract, a promoted employee had some

10  rights to return to their previous position, if they

11  didn't like it, for a certain period of time, I don't

12  recall what that period of time was, and they didn't

13  want to tell us the person was promoted, until they

14  were assured that they weren't going to exercise their

15  return rights to their previous position.

16     Q    And that was an explanation given to you by

17  Patrice Berchtold?

18     A    Yes, it was.

19     Q    And was that explanation satisfactory to

20  you, as -- on behalf of the Commission?

21     A    It was not.

22     Q    And so, the having a possible right of

23  return to a different job is not an exception to the

24  reporting requirement that the Commission has to

25  report within five business days?

1        A        Correct.

2        Q        Is that right?

3                 And, did you so inform Miss Berchtold?

4        A        Yes, we did.

5        Q        And did you say that the Commission

6   expected that hence forth, the county would follow the

7   five day rule?

8        A        That, yes, we did.

9        Q        Now, there is -- there resulted a

10  Commission action at appeal No. 23874, and we are

11  going to mark this as our next deposition exhibit.

12                (Thereupon, Deposition Exhibit No. 4 was

13        marked for identification.)

14  BY MR. TAGGERT:

15       Q        And this document is entitled

16  "Adjudication," and it's 22 pages long, and so I am

17  going to ask you to take a minute with it, or actually

18  as many minutes as you need, until it is familiar to

19  you again.

20                But I believe it involves many of the

21  things that we were just talking about so, please,

22  take your time.

23                Sir, does looking at Exhibit 4, refresh

24  your memory of that?

25       A        Yes.

1    Q    The investigation?

2    A    Yes.

3    Q    The investigation that you were just

4  describing, is that what's discussed in part, in the

5  analysis in that adjudication, Exhibit 4?

6    A    Yes.

7    Q    Now, related, or occurring about the same

8  time, so perhaps related -- and keep Exhibit 4 handy,

9  but we are going to ask to you look at Exhibit 5,

10 which is an April 23 order.

11          (Thereupon, Deposition Exhibit No. 5 was

12        marked for identification.)

13   Q    Sir, have you had a chance to take a look

14 at Exhibit 5?

15   A    Yes.

16   Q    Does it refresh your memory, that the

17 County of Erie filed a request to the Civil Service

18 Commission, to remove Mr. Dows from the caseworker

19 list?

20   A    Yes.

21   Q    Do you recall how you first learned that

22 the county had filed that petition?

23   A    I think that the county told us that they

24 were going to file it.

25   Q    Was that in a -- orally, or a phone

1  conversation?

2     A     I think it was by phone.

3     Q     And do you recall, were you the person

4  involved in that phone conversation?

5     A     I think they may have first talked to

6  Miss Thau.

7     Q     And at some point, did you discuss with

8  Patrice Berchtold, a request to remove Mr. Dows?

9     A     I don't believe that I did.

10           I -- I'm not positive.

11           I may have discussed it with somebody at

12  the Children and Youth.

13    Q     Does any other name come to mind in

14  addition to Patrice Berchtold, someone else it might

15  have been?

16    A     The director at the time, was -- I think

17  her name was Leibel.

18    Q     Debbie Leibel?

19    A     Debbie Leibel.

20    Q     And did Miss Leibel ask you what or how the

21  county might do, to remove someone from the list?

22    A     I don't think so.

23    Q     Same question, do you remember

24  Patrice Berchtold ever asking you what they could do

25  about somebody being on the list, if they didn't want

1    the person on the list?

2        A      Okay.  I must have misunderstood your first

3    question, I didn't think that's what you asked me

4    about Miss Leibel.

5        Q      I apologize.  Thank you.  Because that way

6    we can correct the record, we will take them one at a

7    time.

8        A      Okay.

9        Q      As to Miss Leibel, if I understand right,

10   you think you might have had a telephone discussion

11   with her?

12       A      We -- we may have discussed the general

13   process for requesting an eligible's name be removed

14   from the list.

15       Q      Did it come up in the contact of the Dows

16   inquiry, that you were carrying on about his having

17   been appointed as a per diem, and such?

18       A      No.

19       Q      Okay.

20              And, you will notice that the order

21   references a date when the request was made to remove

22   Mr. Dows.

23       A      Yes.

24       Q      What date does that show?

25       A      It says it was dated February 20th, 2004.

 1       Q      Would you, in your official capacity, have

 2   any notes, or records -- not with you -- but at the

 3   Commission, that would reflect phone conversations

 4   with Miss Berchtold, or Debbie Leibel, about Mr. Dows?

 5       A      I would have no record, no.

 6       Q      In your day-to-day work, as you discuss

 7   differing cases that are pending, and requests, do you

 8   make notes of your conversations?

 9       A      Generally, not.

10       Q      Do you make any sort of audio recording, or

11   something to refresh your memory later, about what was

12   discussed, or what happened?

13       A      I do not.

14       Q      Do you dictate correspondence, to try to

15   memorialize conversations?

16       A      Generally not.

17       Q      Do you recall giving any advice to

18   Ms. Berchtold, or Debbie Leibel, about how the county

19   could proceed if it wished to remove someone from --

20   to ask the Commission to remove someone from the civil

21   service list?

22       A      I may have talked to them about, generally,

23   what the list removal procedure is.

24       Q      Do you recall if you discussed what the

25   standards would be to remove someone, what would

1  constitute inappropriateness for a list?

2      A      I would not discuss that with an agency.

3      Q      Is there regulatory material, or written

4  material that the Commission publishes, or that's in

5  the PA Code, or the Bulletin, or wherever, that

6  explains what the procedure is to ask that someone be

7  removed?

8      A      Yes, there is.

9      Q      And where is that located?

10     A      It's in a management directive, and I'm not

11 sure of what the management directive number is, but

12 it's a Civil Service Commission management directive.

13     Q      Now, do you recall that after the County of

14 Erie requested that Mr. Dows be removed from the civil

15 service list, that he filed a written opposition to

16 that, explaining why he thought he should not be

17 removed?

18     A      Yes.

19     Q      Did that become part of the record in

20 Exhibit 4's docket No. 23874?

21     A      I don't recall.

22     Q      Now, there is Exhibit 5, uses an appeal

23 No. LR2004-010. Was there a separate docket created,

24 regarding Mr. Dows being removed from the list?

25             Is that -- would that indicate that there

1   was a file created at that docket number, regarding

2   the removal of Mr. Dows?

3       A    I am kind of hesitating here, because you

4   are asking a separate document, or separate docket,

5   for Mr. Dows being removed from the list.

6            I wasn't aware his name was removed from

7   the list.

8       Q    I want to apologize, I didn't mean to

9   indicate that.

10           You may recall, I believe our

11  understanding, yours and mine in your earlier

12  testimony, was that the county did request that he be

13  removed.

14      A    Yes.

15      Q    But that never actually happened, he never

16  was removed; agreed?

17      A    Correct.

18      Q    And would the filing of a request to remove

19  an individual from a civil service list, then trigger

20  the creation of a file, and an individual docket

21  number for that matter?

22      A    I don't know for certain.

23      Q    And so, the Exhibit 5 in front of you may

24  or may not represent a separate docket removing --

25  regarding the request to remove Mr. Dows?  You are not

1  sure?

2      A      That's correct, I am not sure.

3      Q      But you do know the Commission declined to

4  remove him?

5      A      Yes, sir.

6      Q      Now, as indicated by the many investigative

7  matters discussed in Exhibit 4, the Commission looked

8  into a number of OCY activities; is that right?

9      A      That is correct.

10      Q      And is it correct to say, that that was

11  sua sponte; that the Commission, based on what you had

12  learned in your initial inquiries, had broad concerns,

13  and wanted to look into how the Commission was

14  handling civil service matters, and -- how the agency,

15  rather, was handling them?

16      A      Yes.

17      Q      At the same time, the request to remove

18  Mr. Dows occurred; is that roughly correct, or fit

19  your recollection?

20      A      At the same time as what?

21      Q      As you were carrying on your investigation,

22  the outcome of which is represented in Exhibit 4?

23      A      Correct, yes.

24              It was around the same time, yes.

25      Q      Now, in its relief in Exhibit 5, there was

1   an order that Mr. Dows' time on the list would be

2   extended, to make up for certain things, and then is

3   it your understanding that Mr. Dows was in fact hired

4   as a caseworker --

5        A     Yes.

6        Q     -- by the county?

7        A     That's my understanding.

8        Q     Did anyone subsequently, later, from OCY,

9   contact you to discuss Mr. Dows' work as a caseworker?

10       A     No.

11       Q     And just to flog the horse a little bit,

12  did anyone from OCY, after the order in Exhibit 5, ask

13  you to take any action against Mr. Dows?

14       A     No.

15       Q     When an individual -- are there certain

16  aspects of signing up to take a civil service test,

17  that are the same for all the tests; in other words,

18  is there one body of basic information everybody gives

19  when he or she signs up to take a test, you know,

20  name, address, date of birth, gender, that -- are

21  there certain items that are just always asked in the

22  civil service forms?

23       A     There are certain items, not necessarily

24  the items that you just gave as examples, but there

25  are certain standard items on the civil service

1   application.

2        Q     What are the absolute standard ones, the

3   ones that are just always there?

4        A     Name, address, Social Security number, the

5   examination you are applying for.

6        Q     Anything else come to mind?

7        A     Education and experience.

8              I think that's -- that's all I can think

9   of, off the top of my head.

10       Q     So, do the forms not consistently ask

11  people's date of birth?

12       A     The date of birth is on a separate

13  attachment to the application, which the candidate can

14  or cannot fill out.  It's the candidate's option

15  whether they complete that part of the application.

16       Q     And do you have a name used for that other

17  document?  How do you refer to that?

18       A     It's called our research questionnaire.

19       Q     Based on what you have heard, and seen

20  professionally, do the majority of people complete the

21  research questionnaire?

22       A     I don't know.

23       Q     But some people do?

24       A     Some people do.

25       Q     Some come back.