IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID A. DOWS , | : | CIVIL ACTION |
|      Plaintiff | : | |
| | : | |
|     v. | : | NO. 04-341 Erie |
| | : | |
| KATHERINE E. HOLTZINGER | : | Judge McLaughlin |
| CONNER, ESQ., Chairman | : | |
| PENNSYLVANIA CIVIL SERVICE | : | |
| COMMISSION and JOHN DOE , | : | |
|     Defendants | : | JURY TRIAL DEMANDED |

Part Two, Deposition of J. Stephen Shartle, pages fifty one through ninety seven inclusive

1            And does the research questionnaire also

2  inquire about the gender of the individual?

3       A       That is correct.

4       Q       And do any of the other data fields come to

5  mind?  What other questions are on the research

6  questionnaire?

7       A       Race, and I believe there is still a field

8  that asks how you found out about this position, this

9  particular examination.

10      Q       On that point, do you know how the intern

11  examination is advertised?  I am using the term

12  "advertised" very broadly.  How was news of its

13  existence disseminated, if you --

14      A       I do not know.

15      Q       Is there a standard protocol that the

16  Commission uses, to tell the public of civil service

17  exams, and when they will be, you know,

18  advertisements, or ad campaigns, or --

19      A       I don't know.

20      Q       Who would know?

21      A       Somebody in our Bureau of Employment

22  Services.

23      Q       Once a civil service test has been created,

24  if only in a draft form, is there a mechanism that the

25  Commission has for determining if the examination has

 1   any particular disproportionate impact on any group of

 2   people, you know, by gender, or by age, or race, or

 3   any other way?

 4        A     I don't know for certain.

 5        Q     When you say "for certain", what do you

 6   know?

 7        A     I would imagine that we have those kind of

 8   figures, but I don't know what's -- if anything is

 9   done with them.

10        Q     Which department would you think would have

11   those figures, if they would exist?

12        A     The Bureau of Personnel Assessment.

13        Q     Are you aware of any analysis regarding the

14   county social casework intern position, indicating

15   whether or not it has -- that examination has any

16   particular skew, relative to age, or race, or any

17   other category?

18        A     I don't know.

19        Q     At any point were you interviewed by any

20   representative of the U.S. Equal Employment

21   Opportunity Commission, regarding a complaint by

22   Mr. Dows?

23        A     Not to my recollection.  I don't recall

24   that.

25        Q     Do you recall being provided written

1  questions, or interrogatories, by any investigator of

2  the EEOC?

3      A      I can recall answering some questions, but

4  I really don't remember whether it was -- whether it

5  was from the EEOC.

6      Q      Do you recall if those questions came from

7  the Pennsylvania Human Relations Commission?

8      A      I don't remember.

9      Q      Did any investigator on the PHRC ever talk

10 to you about any complaint by Mr. Dows?

11     A      Not to my memory.

12     Q      As to the county case -- social casework

13 intern position, do all of the counties in

14 Pennsylvania have casework interns?

15     A      I don't know.

16     Q      In theory, could any of the counties in

17 Pennsylvania choose to use, or request a county social

18 casework intern list, if they wished to do so?

19     A      Any county that has civil service

20 employees, yes.

21     Q      Do all of the counties in Pennsylvania have

22 civil service employees?

23     A      Not all the counties have state civil

24 service covered employees.

25     Q      So, would it be correct, that in some

1    counties there are county caseworkers that are not

2    being hired through the civil service testing

3    procedure, the state civil service testing procedure?

4         A     One county.

5         Q     Which county is that?

6         A     Philadelphia.

7         Q     And because of -- well, it doesn't matter

8    why.

9               Is it unique, in a number of ways; is it an

10   exception for a number of things, having to do with

11   Civil Service Commission, and its rules?

12        A     We don't have civil service coverage of

13   their employees, so I am not really sure what they do.

14        Q     So they are completely out, off the charts,

15   for your purposes, for civil service?

16        A     Yes.

17        Q     And do they have their own civil service,

18   that they use?

19        A     As -- I don't know for sure.

20        Q     Okay.  But as far as you know, the counties

21   other than Philadelphia, do turn to the Civil Service

22   Commission for caseworker lists?

23        A     Yes.

24        Q     Is there any protocol, or standard, that

25   you are aware of, as to when an OCY agency in a county

 1 would ask for the intern list, as opposed to the

 2 county caseworker list?

 3       A     I am not aware of any.

 4       Q     Do you recall an Erie County executive

 5 employee, named Peter Callan, C-a-l-l-a-n?

 6       A     I don't recall.

 7       Q     He was designated as the personnel director

 8 for the county?

 9       A     No.  I don't recall anything with that

10 gentleman.

11       Q     So then you don't recall any dealings

12 between you and Mr. Callan, that had anything to do

13 with Mr. Dows?

14       A     No.

15       Q     Are you aware of any cases, other than the

16 one that brings us here today, where an individual has

17 claimed, in any legal proceeding, that the use of the

18 intern list is unlawful, or improper?

19       A     I -- I have no knowledge of any; any other

20 such case.

21       Q     Now, are you aware of any particular rule,

22 or collective bargaining agreement, with respect do

23 the Pennsylvania Code, or maybe management directive,

24 that allows a county to hire from the intern list,

25 rather than from the caseworker list?

1            Any sort of document, that just

2    specifically addresses that issue?

3        A      The management directive that was

4    Deposition Exhibit 1 --

5        Q      Yes, sir.

6        A      -- allows the agencies to hire trainees, or

7    interns.

8        Q      Do you have any professional familiarity,

9    have you ever heard in your work, why the decision was

10   made to allow hiring off the intern list?

11       A      No, I have not heard anything.

12       Q      Have you ever had occasion on your own, to

13   try to determine why hiring from the trainee list

14   began, or why it's authorized in, among other things,

15   the management directive in Exhibit 1?

16       A      I'm sorry, what's the question?

17       Q      On your own, but within your work, have you

18   ever looked into the origins of authorizing hiring off

19   of trainee lists?

20       A      No, I haven't.

21       Q      Now, would it be correct that Ronald -- is

22   its Rowe or Rowe?

23       A      Rowe.

24       Q      -- Rowe was the executive -- the prior

25   executive director of the Commission?

```
 1      A      Correct.
 2             MR. TAGGERT:   This is 6.
 3             (Thereupon, Deposition Exhibit No. 6 was
 4      marked for identification.)
 5  BY MR. TAGGERT:
 6      Q      We are referencing a letter of December 12,
 7  2003, and if you would take a moment with that.
 8             Sir, just by way of background, when did
 9  Mr. Rowe stop being the executive director?
10      A      Oh, I believe it was around April of this
11  year.
12      Q      And in his letter, he notes that in his
13  opinion the Pennsylvania Code may not govern the
14  county caseworker hiring.
15             Do you recall having any discussions with
16  Mr. Rowe, about the legalities of using the county
17  caseworker intern list for hiring?
18      A      I do not.
19      Q      Do you recall having a discussion with him,
20  about what the sources of law, or authority are, for
21  there to be intern hiring?
22      A      I do not recall that.
23      Q      In addition to the management directive,
24  which is Deposition Exhibit 1 --
25      A      Uh-huh.
```

1       Q       -- do you know of any other sources of
2   authority, for hiring off an intern -- county social
3   caseworker intern list?
4               And take your time, there is no rush.
5       A       Just off the top, I could not think of
6   anyplace else.
7       Q       Now, do you know if the use of the social
8   caseworker intern list has ever been brought to the
9   attention of the U.S. Equal Employment Opportunity
10  Commission, to ask them for an advisory opinion, "Is
11  it okay to do this?"  Are you aware of any inquiry of
12  that type ever being made?
13      A       I am not aware of any.
14      Q       And the same question, but as to our
15  Pennsylvania Human Relations Commission?
16      A       Not to my knowledge.
17      Q       Now, in your work, are you -- have you
18  occasionally bumped into apprentice programs, and
19  their use?  Does the civil service have any
20  involvement with apprenticeship programs of any kind?
21      A       Not that I am aware of.
22      Q       Okay.
23              Are you aware of any inquiries to the U.S.
24  Department of Labor, at any time, asking if the intern
25  programs can receive certification as accepted

1  training programs with the Department of Labor?

2      A      Not to my knowledge.

3      Q      Is there another state agency, that strikes

4  you might have that responsibility, that -- another

5  agency of our state government, that might have had

6  the responsibility to look into possible approval of

7  the intern programs?

8      A      The agency that establishes the trainees or

9  the intern classes, would be the Governor's Office of

10 Administration.

11     Q      Have you ever received any form of

12 communication, you know, oral or written, from anyone

13 at the Office of Administration, of the Governor's

14 Office, stating the legal basis for the county social

15 caseworker intern program, other than Deposition

16 Exhibit 1?

17     A      I have not.

18     Q      And has anybody from the Office of

19 Administration ever alleged to you, in any way, that

20 any -- any agency has reviewed, and approved the use

21 of the intern program, whether it is state or federal

22 agency?

23     A      No, I don't have any such knowledge.

24     Q      Did Mr. Rowe consult you at all, for the

25 development of Exhibit 6?

1       A       Yes.

2       Q       And what did you two discuss, relative to

3    Exhibit 6, and the contents of it?

4       A       Basically, we discussed how we would

5    respond to each one of Mr. Dows' points in his earlier

6    letter.

7       Q       So, do you agree with Director Rowe's

8    comment, that "As stated above, the county social

9    caseworker intern is not a state job title"?

10              That's on page 2, paragraph numbered 4.

11      A       Yes, I agree with that.

12      Q       And because of that it's not in the

13   Pennsylvania Code, or the Pennsylvania Bulletin?

14      A       I don't know that to be a fact.

15      Q       Would I be right, like most sensible

16   people, you have not gone looking for it?

17      A       Right.

18              MR. TAGGERT:  And we are going to mark our

19         next exhibit, and we will ask for your review in

20         a moment.

21              (Thereupon, Deposition Exhibit No. 7 was

22         marked for identification.)

23   BY MR. TAGGERT:

24      Q       And this particular item, Exhibit 7, says,

25   "Examination for County Social Casework Intern," and

1   it is a test announcement, this is probably, you know,

2   bread and butter, day-to-day to you, this sort of

3   thing, but please take a moment.

4           And it is several pages, so be sure to at

5   least skim them, so we are talking about all the same

6   things.

7           Now, are you familiar with the general

8   format of Exhibit 7?

9       A   Yes.

10      Q   It's familiar to you.

11          And does looking at this refresh your

12  memory a little bit about county social casework

13  intern position announcements, and what they say?

14      A   I don't know refresh my memory.  It shows

15  me what it says.

16      Q   Okay.

17      A   I don't know if I had a memory of it

18  before.

19      Q   Okay.

20          Well, we will come to it.

21          And my question is this:  About a third of

22  the way down on page 1, it says, "No written test

23  required."

24      A   Yes.

25      Q   And is it your understanding, that actually

1   the interns don't, on a given moment, sit down and

2   take a written test?

3       A    That's what this says, yes.

4       Q    Okay.  And I am not trying to be a wise

5   guy, I just don't work with this civil service stuff.

6            And then the document, Exhibit 7, goes on

7   and talks about various things, and on page 3, under

8   "Testing," which is in the bold black --

9       A    Uh-huh.

10      Q    -- it says, "You will be rated on your

11  experience and training.  Your score will be based on

12  what you report in your Application for

13  Employment/Promotion, and Application Supplement."

14           So, would it be correct, that completely

15  filling out the form, and its supplement, is, if you

16  will, the test?

17      A    That is correct.

18      Q    Now, when an intern fills out Exhibit 7,

19  where does -- where does a completed Exhibit 7

20  go?  You know, physically, where does it travel?

21      A    It goes to the Civil Service Commission.

22      Q    I mean, it's mailed directly back to

23  Harrisburg?

24      A    I don't know with this particular program

25  whether it has to go through some other -- through the

 1  school first, or whether it goes to the agency first,
 2  some of our exams do that.
 3      Q    So it's possible that Exhibit 7 may go to a
 4  college that the intern is attending?
 5      A    It says you submit it directly to the Civil
 6  Service Commission, so it does go directly to the
 7  Civil Service Commission.
 8      Q    Now, and once it arrives at the Civil
 9  Service Commission, to which department would it be
10  directed?
11      A    It would be directed to our Bureau of
12  Personnel Assessment.
13      Q    And would an employee of that bureau
14  actually hands on review the completed Exhibit 7?
15      A    Yes.
16      Q    And that could be any of several people who
17  would have that responsibility?  I don't know how many
18  employees you have.
19      A    I don't know.  Some job titles, they have
20  one individual that specializes in that job title.  I
21  don't know with this job title if they do that or not.
22      Q    Okay.  So there might be a specialist, or
23  several different people might be generally familiar
24  with that job title.
25               And how would the reviewing person then

 1  analyze and grade the test, for example, would they

 2  have a template, would they have an example of a

 3  particularly solid answer, so they had something to

 4  work with?

 5      A    I don't know.

 6      Q    Are there other job titles -- class titles,

 7  rather, where there is no written test required; that

 8  the application is the test?

 9      A    Yes.

10      Q    And are you personally familiar with any of

11  those, as to how the Commission figures out how to

12  score them, you know, how to grade them?

13      A    I do not know, for any of the classes, how

14  we do the scoring.

15      Q    Would that mostly be something people

16  within the Bureau of Personnel would know?

17      A    The Bureau of Personnel Assessment.

18      Q    Assessment.

19      A    Yes.

20           MR. TAGGERT:  Now, this will be Deposition

21      Exhibit 8.  And, you will find in a moment, that

22      that has to do with the test announcement to be a

23      county caseworker.

24           (Thereupon, Deposition Exhibit No. 8 was

25      marked for identification.)

1  BY MR. TAGGERT:

2      Q     Sir, again, if you would take a moment with

3  that.

4            Now, Exhibit 8 is an announcement for

5  county caseworker; is that correct?

6      A     That is correct.

7      Q     And the county caseworker job has an actual

8  test instrument that's administered; is that right?  I

9  mean, it is an actual test that people sit for, and

10 answer questions on an examination; is that right?

11     A     All of -- I just want to be clear, we

12 consider filling out an application and a supplement

13 to be a test, also, and so, yes, it's a different type

14 of test, but they are both tests.

15     Q     All right.  For the sake of our eventual

16 readers --

17     A     Okay.

18     Q     -- I would like to work out with you a way

19 of, you know, labeling these two different approaches,

20 that you feel comfortable with.

21     A     Okay.

22     Q     What would you suggest, you know, we are

23 talking about the -- might we call it an

24 application/exam, or what would you feel comfortable

25 with?

1    A    Well, us people, who have been here a long

2    time, call ones like social casework intern, an

3    unassembled exam.

4    Q    Unassembled?

5    A    Unassembled, because people don't have to

6    assemble in one spot to take the test.

7    Q    So that's almost a term of art, within the

8    Commission?

9    A    Yes.

10    Q    An unassembled exam, I am going to try to

11    use that.

12    A    That is an old term, that not probably many

13    people use any more, except people who have been

14    around as long as me, which is hardly anybody, I guess

15    most people now call it an E&T exam, rating of

16    education and training.

17    Q    E&T?

18    A    E&E.  Education and experience.

19         I don't even know what these youngsters

20    call it.

21    Q    So we will call it an unassembled exam.

22    A    Okay.

23    Q    And what would you like to call the other

24    type, if you will?

25    A    We can just call that an exam.

1    Q    We have an unassembled exam, and an exam?

2    A    Yes.

3    Q    Okay.

4    A    Or written exam.

5    Q    So I am going to try to stick with that

6    language, and if I am slipping away, just --

7    A    I was just trying to make it clear, that we

8    consider everything to be an exam.

9    Q    Now, with a written exam, and specifically

10   the one, the announcement of which you see in front of

11   you, the examination instrument has been developed,

12   and eventually written by the Civil Service

13   Commission; is that correct?

14   A    That is correct.

15   Q    Okay.

16        And it is administered by your staff, or

17   people under their direct supervision; is that right?

18   A    Under my direct supervision?

19   Q    No, the Commission's?

20   A    The Commission's direct supervision,

21   correct.  Yes.

22   Q    And then does it have any subjective, or

23   essay components, or is the examination for caseworker

24   to right or wrong answers, you know, all or nothing?

25   A    The exam announcement indicates that it's

1  all multiple choice types of questions.

2      Q      And, if you know, is the grading then done

3  by hand, or is it a machine gradable sort of

4  instrument, you know, with blanks filled in, so that

5  they can be machine read?

6      A      Our exams are -- our written exams are now

7  all computerized, so the person would take it on the

8  computer, and the computer system would determine the

9  number of right and wrong answers.

10     Q      So, it's fair to say that, in a sense, it

11  is graded by the computer program?

12     A      Yes.

13     Q      Which has no preferences of any kind; I

14  mean, it doesn't know gender, it don't know any of

15  that stuff?

16     A      I hope not.

17     Q      And so that's how a caseworker, county

18  caseworker 2 exam would be graded?

19     A      Yes.

20     Q      Okay.

21            When an unassembled exam is reviewed, do

22  you know if just -- if only one person grades it, or

23  do multiple people grade it, to make sure that, you

24  know, they are in the right zone?

25     A      I don't know.

1    Q    And does the grading occur back here in
2  Harrisburg; it makes it here, and your staff, some one
3  or more persons in your staff, the Commission's staff,
4  looks at it?

5    A    the Commission's staff grades it.  I don't
6  know that that happens in our Harrisburg office, or
7  one of our other offices.

8    Q    And if matters were coming out of Erie
9  County, if they weren't done here in Harrisburg, would
10  they go to Pittsburgh office?

11    A    That is correct.

12    Q    So it might be one or the other, or some
13  mixture of the two offices?

14    A    Yeah.  I just don't know for sure.

15    Q    Now, in an unassembled exam, does the
16  candidates taking the exam have a mechanism for
17  challenging the grading; in other words, it sends --
18  it does -- it is not plotted against a template of,
19  you know, exact answers, like a machine graded exam,
20  or a computer graded exam; does the applicant have any
21  way to ask for a review of his or her grade?

22    A    Any applicant, for any type of exam, has
23  the right to do that.

24    Q    So the same mechanism would be available to
25  a would be trainee, who would take an unassembled

1  exam?

2      A      Yes.

3      Q      And what would that process involve, for a
4  person who had taken the -- well, it would be the
5  same, what would that process involve for somebody who
6  wanted a review of his or her grade?

7      A      I don't know.

8      Q      And would that be handled within
9  Assessment; is that who would respond to the inquiry
10 about the grade?

11     A      I believe that's the case, yes.

12            Again, I am not positive.

13     Q      Do you know, in the unassembled exam, for
14 caseworker intern, when a grader receives it, is the
15 identifying data removed from the application?

16     A      I don't know.

17     Q      Are you aware of any general rule, within
18 the Commission, that in the grading of examinations,
19 the grader, whether it's human or otherwise, is really
20 not to have any identifying knowledge of the
21 applicant; in other words, not know, you know, gender,
22 and race, and all of that, so it can be a neutral view
23 of the examination?

24     A      I don't know.

25     Q      Do you have any knowledge about how the

 1  County of Erie chooses, when its OCY, which I

 2  understand has now been changed to Child Protective

 3  Services, chooses to request an intern list for

 4  hiring, as opposed to requesting a county caseworker

 5  list for hiring?

 6      A    I have no knowledge of that.

 7      Q    In your investigation of their practices,

 8  that you carried on, did you notice any pattern as to

 9  the county's request for the two lists?

10      A    Not that I can recall, no.

11      Q    Do you recall having any dealings, that in

12  any way referenced Mr. Dows with an attorney named

13  John Onorato, who is the Erie County Solicitor?

14      A    I don't recall speaking to that gentleman.

15      Q    Now, did he represent -- you testified in a

16  hearing, about your investigation.

17      A    That is correct.

18      Q    And that was in Pittsburgh, Pennsylvania?

19      A    Correct.

20      Q    And does it refresh your memory, that

21  Mr. Onorato was the attorney for the county at that

22  particular hearing?

23      A    Okay.

24           I didn't recall who the attorney was.

25      Q    But does that now sound correct to you,

1  when you think about that?

2      A     That's what it says.  That doesn't change
3  my answer.  I don't recall speaking to him.

4      Q     So, except for being present in the same
5  hearing room at the State Office Building in
6  Pittsburgh, you don't have any other recollection of
7  dealing, or having involvement with Mr. Onorato; is
8  that right?

9      A     On something about Mr. Dows.

10     Q     Now, somewhat on that last point, would it
11  be correct that there was never a hearing, a formal
12  notice given of a hearing, about the County of Erie's
13  request to remove Mr. Dows from the civil service
14  list?

15     A     I don't know that for a fact.

16     Q     But you never participated in one?

17     A     That is correct.

18     Q     And would you please tell us what you know
19  about the Commission's decision to refuse the County
20  of Erie's request to remove Mr. Dows from the civil
21  service list?

22          We have already, this morning, talked about
23  the fact that the county asked for him to be removed,
24  Mr. Dows responded in writing, with attachments, and
25  what do you recall happening that eventually led to

1   the commission's decision to refuse the county's
2   request?
3              And, for example, were you in discussions
4   about it, or --
5        A      Not with the Commissioners.
6              I can recall that somebody in my chain of
7   command, and I don't recall whether it was my bureau
8   director, or the deputy director, or the executive
9   director, asked me for whatever information I had on
10  Mr. Dows' previous employment, and at Erie Children
11  and Youth, and his subsequent termination.
12       Q      And as you understand it, who had the final
13  decision as to whether or not the county's request
14  would be granted?
15       A      The Civil Service Commissioners.
16       Q      And were you aware of that issue being
17  brought in front of the Commission; the request to
18  remove Mr. Dows being brought in front of the
19  Commission?
20       A      I think one of these exhibits was a
21  Commission order.
22       Q      Right, it is.
23       A      Which would result from that -- Deposition
24  Exhibit No. 5 is the result of that being brought in
25  front of the Commissioners.

1      Q      Agreed.

2             And so, what has -- the gap I am trying to

3   fill in, is we have the request that Mr. Dows be

4   removed, and we have -- we know that he responded in

5   writing, and then we have an outcome, but to the best

6   of your knowledge, was there ever a hearing on the

7   issue of removing Mr. Dows?

8      A      I am not aware that there was a hearing.

9             I have no knowledge of a hearing.

10     Q      Neither do we.

11            And since it worked out fine for him,

12  that's okay.

13            But do you recall having any communication

14  with the County of Erie, or its representatives, where

15  you suggested that it might withdraw its request that

16  Mr. Dows be removed from the list?

17     A      I don't recall that, any such conversation,

18  no.

19     Q      Now, referencing the announcement for

20  county caseworker 2, would it be correct that that

21  particular test requires that a person have a college

22  degree to sit for the test?

23     A      That is not correct.

24     Q      So, what formal education would be

25  required, as you understand it?

1       A       In order to qualify, the individual would

2    have to have a minimum of 12 college credits in social

3    science types of courses.

4       Q       If you know, would there be any weight

5    given to having more college education?  Or is that

6    simply a threshold test, to be able to sit for the

7    exam?

8       A       It's a threshold test, to be placed on the

9    list, if you pass the exam.

10      Q       Well said.

11              And is it permissible, under a Rule of 3,

12   for a hiring authority to look at the amount and type

13   of formal education a person has, among the top three

14   applicants; in other words, could a hiring authority

15   sort out among the three, based on formal education

16   the person had?

17      A       I don't know.

18      Q       You haven't run into that particular issue,

19   professionally?

20      A       I haven't run into that particular issue.

21      Q       As to the County of Erie's request that

22   Mr. Dows be removed from the civil service list, do

23   you recall interviewing him, either by telephone, or

24   in person, to discuss that issue?

25      A       I don't recall doing that, no.

1    Q    Do you recall on that topic, do you recall
2  interviewing any County of Erie employees?
3    A    On this specific topic, no, I don't recall
4  that.
5    Q    Did you interview any persons who had
6  worked with Mr. Dows, regarding his job performance?
7    A    No.
8    Q    Did the Commission form its final -- its
9  opinion, about the county's request, based on the
10  documentary evidence; and by that I mean, if there
11  were not interviews of Mr. Dows, or people with whom
12  he worked, was the decision basically made on paper,
13  on the documents that had been submitted by the
14  parties?
15    A    I don't know.
16    Q    Were you ever asked your opinion, as to
17  what the Commission should decide, as to the removal
18  of Mr. Dows?
19    A    By people at my chain of command?
20    Q    Yes.
21    A    No.
22        By the Civil Service Commissioners.
23    Q    But in your chain of command, you were?
24    A    Yes.
25    Q    And what did you tell them?

1     A     I told them that we should -- that his name
2  should not be removed from the list.
3     Q     And what were the main reasons you believed
4  that?
5     A     Because his appointment to a caseworker job
6  wasn't done in accordance with civil service
7  regulations, his termination from the caseworker job
8  was not done in accordance with the civil service
9  regulations, and I thought he deserved the opportunity
10  to be hired properly, and given the chance to do the
11  work.
12     Q     And then let that show what he could or
13  could not do?
14     A     Correct.
15     Q     Are you aware of the county social
16  caseworker intern position being described, or
17  addressed in collective bargaining unit -- in
18  collective bargaining agreements that the counties
19  have?
20     A     I have no knowledge of county collective
21  bargaining agreements.
22     Q     Is there any part of the Commission that
23  has any knowledge, or makes a point of knowing if
24  there is an interface, or relationship between
25  collective bargaining agreements, and the class titles

1  and descriptions that are developed, and so that they
2  match?
3      A    I am not aware that anyone in the
4  Commission would do that.
5      Q    So, for example in our case, in Erie
6  County, do you even know if a collective bargaining
7  agreement addresses the job or class title county
8  social casework intern?
9      A    I have no knowledge.
10      Q    Now, would it be correct that it is
11  permissible under civil service regulations, for the
12  hiring authority to have a reasonable probationary
13  period?
14      A    Civil service regulations establish a
15  probationary period.  I suppose an agency could have
16  their own, but it can't be in conflict --
17      Q    It can't conflict?
18      A    -- with the civil service provision.
19      Q    So it certainly couldn't be shorter than
20  the mandated civil service time period?
21      A    It could be shorter.  But they would still
22  have to serve the full civil service probationary
23  period.
24      Q    So are you telling us that where there is a
25  conflict, between the -- a probationary period the

1    hiring authority believes that it has, and the

2    required civil service length, the longer civil

3    service length applies?  That's the actual

4    probationary period that would be accepted?

5       A    I don't want to give a long winded answer,

6    but the probationary period the county gives could be

7    for some different purposes; when you get benefits,

8    when you get a pay increase, things that are not

9    within the purview of the Civil Service Commission.

10      Q    Yours is about performance?

11      A    About performance, exactly.

12      Q    Entirely?

13      A    Exactly.

14      Q    All right.  That was both short winded, and

15   got to the point.

16           Now, are you familiar with a state civil

17   service form called "Availability Survey/Interview

18   Notice"?

19      A    Yes, I am.

20           MR. TAGGERT:  Off the record.

21           (Discussion off the record.)

22           (Thereupon, Deposition Exhibit No. 9 was

23        marked for identification.)

24   BY MR. TAGGERT:

25      Q    And if you would take a look at Exhibit 9

1  and identify that for us.

2      A      That is SCSC Form 98, availability
3  survey/interview notice.

4      Q      And what is the function of that form, as a
5  form, not just this particular example of it, the
6  general --

7      A      The function of the form is for an agency,
8  with civil service positions, after they receive the
9  civil service list, or certification, this form is
10 used to contact the eligibles on the list, to either
11 determine their availability for the position, or to
12 schedule them for interview.

13     Q      Now, if an individual responds to this
14 form, saying that he or she is not currently
15 available, does that person lose his or her place on
16 the list, or just wouldn't be offered a job at that
17 time, if there is a job available?

18     A      If they are not available at that time, and
19 depending on what they say -- if they say, "I am not
20 available at this time," that would just apply to that
21 list that the agency has at that moment.

22             The next time they get a civil service
23 list, or certification, the person would be
24 available -- they would have to be contacted again, to
25 see if they are now available.

1     Q     So the person isn't renouncing their place
2  on the list, just their chance for a job at that
3  moment?

4     A     At that moment.

5           Although there are blocks That could be
6  checked, to say, "I don't want to be contacted any
7  more."

8     Q     In which case, the person would really be
9  saying, "I am abandoning this particular list, my
10  place on it"?

11     A     Correct.

12     Q     Do you recall in your dealings with Office
13  of Children and Youth, in Erie, having dealings with
14  an administrator named Paul Concella, C-o-n-c-e-l-l-a?

15     A     I don't recall ever speaking to that
16  person.

17     Q     This is just in case it might refresh your
18  memory, I am not challenging you otherwise, but this
19  might have been a person who, when you were
20  investigating the per diem hires, and so forth, might
21  have told you that Mr. Dows did have a per diem job,
22  but that he would be let go, or be fired?

23           Or he might have told you, Mr. Concella
24  told you that he didn't believe that Mr. Dows should
25  be allowed to apply for a caseworker 2 position?

1     A     In regard to our investigation, I did not

2  talk to any male individual, about the case, or what

3  we were investigating.

4     Q     So that way you can be pretty sure you are

5  ruling out Mr. Concella?

6     A     Yes.  Yeah.

7     Q     In your investigation, did any of the

8  County of Erie employees, or their attorney, the

9  county's attorney, tell you that economic reasons

10 drove any of the decisions they made relative to

11 Mr. Dows, or hiring per diems?

12    A     I don't recall that being a reason.

13    Q     Something along the line of they were

14 trying to save money?

15    A     That could have been said, it's possible, I

16 don't recall that specifically.

17           (Thereupon, Deposition Exhibit No. 10 was

18      marked for identification.)

19 BY MR. TAGGERT:

20    Q     Sir, if you would take as long as you need,

21 with Deposition Exhibit 10.

22           If I accidentally shorted you, it is purely

23 by accident.

24    A     It is a little short.  I am not sure what

25 all is missing, but it is a little short.

1          We have got some things in the back

2    missing.

3      Q      So there were attachments, that customarily

4    would be with it?

5      A      Yes, and it does feel thin, so I am not

6    sure if there are other things that are missing, or

7    not.

8          MR. TAGGERT:  Let's go off the record.

9          (Discussion off the record.)

10     Q      Sir, all of us collectively realize that

11   what I had originally given you as Exhibit 10 was

12   defective, because apparently the photocopying

13   resulted in it only having every other page; is that

14   correct?

15     A      That's correct.

16     Q      And you now have been given Exhibit 10,

17   that appears to have all of the pages?

18     A      That is correct.

19     Q      Okay.

20          Would you generally describe for us, what

21   is Exhibit 10?

22     A      Exhibit 10 is the certification of

23   eligibles for the classified service manual, which is

24   in our management directive system as M580.1.

25     Q      And how often is there any regular interval

 1  at which this document is amended, or revised;

 2  annually or, you know, some formula that you use?

 3      A    In the past, there was not a formula.  The

 4  Governor's Office is currently coming up with a format

 5  law, to ensure that the directives are updated more

 6  timely, on a recurring basis.

 7      Q    Now, it is my understanding that the

 8  Exhibit 10 version, that you have in front of you, is

 9  the one that was in effect at the time you were

10  carrying on your investigation of the Dows matters.

11      A    That is correct.

12      Q    Do you know, is there a new one, a newer

13  one, since that Exhibit 10?

14      A    I'm assuming that this is the most current

15  one.

16          There has not been one published since we

17  investigated Erie County Children and Youth.  I can't

18  say for certain whether the 1997 one is the current

19  edition or not.  I don't recall what the current

20  edition's date is.

21          (Thereupon, Deposition Exhibit No. 11 was

22      marked for identification.)

23  BY MR. TAGGERT:

24      Q    And, sir, I am now showing you Deposition

25  Exhibit No. 11, it says, "Test Announcement, Exams for

 1   County Caseworkers, County Caseworker 1, 2 and 3."

 2            Take your time with that.

 3       Q    Have you had a chance to look at that, sir?

 4       A    Yes.

 5       Q    And what is it?

 6       A    It is the examination announcement for

 7   county caseworker 1, county caseworker 2, and county

 8   caseworker 3, amended and reissued on March 19th 2004.

 9       Q    Now, if you know, did that change anything

10   from the prior situation; are there more categories of

11   caseworker, or did it change anything you know of?

12       A    It changed the minimum requirements for

13   county caseworker 1.

14       Q    In what way were they changed?

15       A    The previous announcement listed one year

16   experience as a county social service aide 3, and the

17   Commission added, "or in a similar position performing

18   paraprofessional case management functions."

19       Q    Do you know what reasons the Commission had

20   for making that change?

21       A    We had received some complaints, in regard

22   to the fact that there was -- that we were not

23   qualifying people who had experience that was

24   equivalent to county social service aide 3, but they

25   weren't specifically county social service aide 3's.

1    Q      What kind of examples, of equivalent, or
2    similarity were brought to the attention of the
3    Commission?
4    A      Positions in private industry, for example,
5    or in, maybe like nursing home, or something to that
6    effect, where they did similar work to what a county
7    social service aide 3 would do.
8    Q      And the equivalency would be examined after
9    the actual testing; is that right; in other words --
10   A      Typically, yes.
11          Not always.
12   Q      Okay.
13          So, taking into account this newest
14   exhibit, are there really four categories of county
15   social caseworker, the intern, and then the three that
16   are listed in the exhibit that you are looking at?
17   A      This didn't change that.
18   Q      So --
19   A      But in exam -- I am not sure I understand
20   the question.
21   Q      Let me withdraw it, or ask a better one, or
22   at least a different one.
23   A      Okay.
24   Q      Which is:  Are there four categories of
25   county caseworker, one of them is intern?  The class

1  title?

2      A     I can't say that because, there is other

3  county caseworker classes.  There is county caseworker

4  supervisor, there is a couple of levels of county

5  casework managers, so --

6      Q     But nonmanagerial levels?

7      A     I can't limit it to four.

8      Q     Would it be right if we eliminated

9  managerial, would you feel comfortable in saying there

10  are four?

11      A     Then there is four, yes.

12      Q     And those, in a sense, would be considered

13  entry level positions?

14      A     No.

15      Q     The intern would be?

16      A     The intern would be entry level.

17      Q     Right.  Which other one, if any, would be?

18      A     County caseworker 1, would be considered an

19  entry level.

20            For some counties, county caseworker 2

21  could be an entry level.

22      Q     Would you explain that a little bit?

23      A     Well -- and I don't know all of the

24  functions the county caseworkers perform, because I am

25  not a classification expert.  But county Caseworker

1   2's work more independently than county caseworker 1.

2   Some counties would prefer to hire more people who can

3   work more independently, who have more experience.

4        Q    Oh, I see.

5        A    And for that county, that's the level that

6   they appoint people.

7        Q    So a county can choose to bring people in

8   at these different levels, based on their judgment of

9   the experience the person is bringing?

10       A    Correct.

11       Q    Okay.

12            But, for all of the positions, except

13   intern, there would be a standard written exam, as

14   opposed to the unassembled exam; would that be right?

15       A    For the three caseworker jobs that we

16   discussed, that is correct.

17            MR. TAGGERT:  This is a good time to

18       suggest we take a little break.

19            (Recess taken.)

20            (Thereupon, Deposition Exhibit No. 12 was

21       marked for identification.)

22   BY MR. TAGGERT:

23       Q    Sir, I am going to show you examination

24   results, Deposition Exhibit 12.

25            Would you take a moment with that?

1      A      Sure.

2      Q      And, sir, what exactly is Exhibit 12, and

3    what information does it tell you?

4      A      This is a notice of examination results for

5    Mr. Dows, dated June 25th, 2003, which gives his

6    examination results for the county caseworker 2, and

7    indicates that he is No. 2 on the list.

8      Q      And that would be for two counties, Erie

9    and Crawford?

10     A      That would be for Erie County and Crawford

11   County.

12     Q      Now, we are going to double back on a few

13   things we talked about earlier.

14            And when the County of Erie requested that

15   Mr. Dows be removed from the civil service list, did

16   you learn, in your investigation, that after that

17   request some persons were hired in the caseworker

18   position, while the request of the county was pending

19   with the Commission?

20     A      Yes, I was aware of that.

21     Q      In a request to remove an individual from

22   the list, is the burden of proving that should happen

23   on the requesting party; in this case, would it have

24   been on the County of Erie to have proven a reason

25   that was adequate to remove Mr. Dows?

1     A    I don't know.

2     Q    Now, Mr. Dows was treated as if he was --

3  in that period, after the request, seemed to have been

4  treated as if his situation was in a suspense status,

5  while it was resolved.

6         Is -- would that be customary, that until

7  there was a resolution of the request to remove

8  someone, he or she would not be placed in a position?

9     A    That is up to the agency, whether they want

10  to appoint an individual in the meantime.

11     Q    Now, did they do that at their own peril,

12  in the sense that if the person, of whom they are

13  complaining, is not removed from the list, then

14  perhaps they have put the wrong -- or lower person in

15  the position?  Do they assume that risk, by proceeding

16  to hire for the position?

17     A    I'm getting a bit confused.

18     Q    Okay.  To refresh your memory -- and the

19  document that might do that, Exhibits 4 and 5, might

20  help you in the orientation to this situation.

21     A    I guess I was more confused by the question

22  itself.

23     Q    Sure.

24         In the spring, after its request, the

25  County of Erie went ahead and hired some caseworkers;

1  is that right?

2      A      Yes, that is correct.

3      Q      And their choices, from the list, were made

4  as if Mr. Dows was not on the list?

5      A      Correct.

6      Q      Is that fair?

7      A      Correct.

8      Q      But of course, he was.

9      A      Correct.

10     Q      Which later the Commission would deal with,

11  in its order.

12     A      Yes.

13     Q      But, while the Commission was -- do you

14  have an opinion as to whether the County of Erie was

15  in its rights to hire, without hiring Mr. Dows, simply

16  because they had made the request?

17     A      In my opinion, they were within their

18  rights, yes.

19     Q      And if the Commission eventually decided

20  that Mr. Dows should have been removed from the list,

21  there would have been no harm and no foul?

22     A      That is correct.

23     Q      But if the Commission had decided that it

24  was wrong, which it eventually did, while incorrect

25  removed Mr. Dows from the list, then that would mean,

 1   in practical terms, someone had the position that

 2   should have been offered to Mr. Dows?

 3        A      That is correct.

 4        Q      And the Commission then worked to rectify

 5   that as best it could, with its order?

 6        A      We -- we ordered the Erie County Children

 7   and Youth agency to appoint Mr. Dows, in order --

 8   because of the other two appointments they had.

 9        Q      Right.

10               And it would be their decision, if they

11   then wanted to, if you will, bump the last person in

12   the chain, or accept the fact that they had one more

13   hire than they had originally planned to have; is that

14   right?

15        A      I am not sure I understand that.

16        Q      Assuming, for the sake of discussion, that

17   the County of Erie had, while ignoring, for whatever

18   reason, Mr. Dows, had hired the number of people that

19   it had wanted to have, and then was ordered to hire

20   Mr. Dows, it was the county's prerogative to decide

21   whether it wanted to simply have one more person, or

22   hire Mr. Dows and drop whoever would have been the

23   lowest ranking person on the civil service list, out

24   of the people they did hire; would that be right?

25        A      We only required them to hire Mr. Dows.

1     Q     And then however it plays out, after that,
2  is not your concern, unless it seems to offend an
3  individual, and brings to your attention a possible
4  violation of the civil service laws and regulations?
5     A     I suppose that would be possible, yes.
6     Q     So really, unless it seemed to cause a
7  problem to someone else, who chose to complain of it,
8  that would not be of formal interest to the Commission
9  how the situation played out of Mr. Dows was hired?
10    A     Our only concern was that Mr. Dows be
11  hired.
12    Q     Now, in the description of the entry level
13  requirements to be a social worker intern versus
14  coming in as a caseworker, the amount of experience
15  is -- required, is different for the two lists.
16    A     Okay.
17    Q     Do you have any knowledge of the decision
18  making, or any discussions about how to set the amount
19  of experience that would be necessary to be considered
20  on the trainee list?
21    A     I don't have any knowledge of that.
22    Q     Now, in the unassembled test, which is a
23  useful term we have used in referring to, among other
24  tests, the county social intern caseworker, there are
25  various areas that a scorer, a reviewer must give a

 1  weight to.  I apologize for ending with a preposition.
 2                Is it your testimony, which is
 3  double checking from before, that you are not sure,
 4  not aware of how those tests are graded?
 5      A     That is correct, I am not aware of how they
 6  are graded.
 7      Q     Have you worked with any other unassembled
 8  test situations, and are you -- and are you aware of
 9  how those tests' subjective areas are graded, or
10  weighed?
11      A     I am aware that that exists, yes.
12      Q     Do you pick up any broad rules, general
13  application, about how reviewers or graders are
14  supposed to look at the unassembled test data, to
15  weight it, and evaluate it?
16      A     I have no knowledge at all of that.
17      Q     When the County of Erie was hiring shortly
18  after it had asked to have Mr. Dows removed from the
19  list, did it make any contact, of which you are aware,
20  with anyone in the Commission, asking if it was
21  acceptable for it to proceed with hiring before the
22  resolution of the Dows matter?
23      A     I don't recall any conversation like that.
24      Q     And none of your co-workers, or
25  Commissioners, ever commented that they have been

1  contacted in that regard; is that right?

2      A     Not that I recall.

3      Q     Can applicants, for the county caseworker

4  positions, change the counties in which they are

5  interested, during the life of a list; can they change

6  their mind?

7      A     Yes, they can.

8      Q     So as long as they stay within whatever

9  that maximum number of counties is, which we don't

10 know right now, but whatever it is, they can change

11 which counties they are shooting for employment in?

12     A     That's correct.

13     Q     Is there a requirement that an individual,

14 who is an intern, reside in the county where he or she

15 is asking to serve?

16     A     Are you asking if there is a civil service

17 requirement?

18     Q     Right, civil service requirement, that the

19 interns actually live in the county where they are --

20     A     No, there is not a civil service

21 requirement.

22     Q     Okay.

23           And so a person could even be from outside

24 of the Commonwealth, and be applying to work?

25     A     I don't know if there is a Pennsylvania

 1   residency requirement for that class.

 2       Q    Oh, okay.

 3       A    Or not.  Some classes have a Pennsylvania

 4   residency requirement.

 5            MR. TAGGERT:  If you will excuse us for

 6       what I think will be a one minute break.

 7            (Recess taken.)

 8            MR. TAGGERT:  We can go back on the record.

 9   BY MR. TAGGERT:

10       Q    Sir, except for any follow up, that might

11   be needed for anything attorney Lloyd chooses to ask,

12   we have no further questions.

13            Thank you, very much.

14            THE WITNESS:  Thank you.

15            MS. LLOYD:  And I don't have any follow

16       ups, so --

17            MR. TAGGERT:  So, sir, you are a free man.

18            MS. LLOYD:  You have the option to read and

19       sign this deposition transcript, looking for any

20       errors, or anything.  Would you like to do that?

21            THE WITNESS:  Should I do that?

22            MR. TAGGERT:  I need to point out one

23       thing, that you may not know, this man is the

24       greatest court reporter east of the Mississippi.

25            MS. LLOYD:  I usually suggest that you do,

1          just in case.

2                    THE WITNESS:  Yes.  Okay.

3                    MS. LLOYD:  So, yes.

4                    THE WITNESS:  I will do that.

5                              - - -

6                    (Thereupon, at 12:25 o'clock p.m., the

7          deposition was concluded.)

8                              - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25