## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID A. DOWS , | : | **CIVIL ACTION** |
| Plaintiff | : | |
| | : | |
| v. | : | **NO. 04-341 Erie** |
| | : | |
| KATHERINE E. HOLTZINGER | : | **Judge McLaughlin** |
| CONNER, ESQ., Chairman | : | |
| PENNSYLVANIA CIVIL SERVICE | : | |
| COMMISSION and JOHN DOE , | : | |
| Defendants | : | **JURY TRIAL DEMANDED** |

Part seven , Deposition of Charlene Kolupski, pages fifty one through ninety four inclusive

 1    currently, is 120 hours of what is referred to as

 2    caseworker core training.

 3         Q      Are there additional modules, that are

 4    added on to the core training?

 5         A      The state training program is designed to

 6    provide training to new and experienced staff.

 7                So, the state training program provides

 8    additional training, other than the 120 hours of core

 9    training.

10         Q      But that's more advanced training, usually?

11         A      Yes.

12         Q      Now --

13         A      What is required of new staff, is the

14    120 hours of training, within the first 18 months of

15    their employment.

16         Q      Is there then a continuing education

17    requirement --

18         A      Correct.

19         Q      -- to have so many hours per year, or

20    something like that?

21         A      20 hours.

22         Q      Now, when the interns become

23    caseworker 2's, are they exempt from that 120 hours of

24    core training, or do they also take that?

25         A      The interns, as part of their internship,

1    start participating in the 120 hours of training,

2    during the course of their internship.

3            They are not exempt from the training.

4        Q    They have already had it, as part of their

5    training, while they were an intern?

6        A    Usually they haven't completed the

7    training.  They are close to completion, but they

8    haven't completed it.

9        Q    And is the intern's training typically

10   advanced enough, that they are exempt from some of

11   these more advanced training for the next few years;

12   in other words, are these things that they already

13   know, from their going through the training process?

14       A    Going through what training process?

15       Q    Well, now, the interns, in their

16   internship --

17       A    Yes.

18       Q    -- does their training in that activity

19   become advanced enough, and complex enough, that they

20   can place out of some of these later trainings?

21       A    Not currently, no.

22       Q    So mostly, they have met many of the

23   requirements of the basic core 120 hours training?

24       A    Yes.

25       Q    And so they don't have to devote quite as

 1    much of their time to attending that training, as do
 2    the people hired off the merit civil service list?
 3        A    Correct.
 4        Q    And then after a year or two, those
 5    differences can all balance out, and everybody is at
 6    about the same place?
 7        A    Correct.
 8        Q    Is there any economic advantage to the
 9    trainees, in having -- by starting as caseworker 2's;
10    will they in effect, if one person began as off the
11    merit list, and another person began on the trainee
12    list, off the trainee list, on the same day,
13    eventually will their incomes, assuming everything
14    else being equal, become roughly the same, or is the
15    trainee always a little ahead of the game,
16    professionally?
17        A    They are equal.
18        Q    So at some point, they will all pull even,
19    and --
20        A    Well, they started on an even playing
21    field.
22        Q    So once they are trainee 2's, there is no
23    advantage, their time as a trainee doesn't cause them
24    to be paid at a higher rate?
25        A    Correct.

1      Q      Do they have -- does their seniority date

2   go back to when they began as trainees?

3      A      No.

4      Q      It begins when they go on the regular

5   payroll --

6      A      Correct.

7      Q      -- as caseworker 2's.

8             So, for layoff, and other similar purposes,

9   their service date would not be when they became

10  trainees, but when they became permanent hires?

11     A      Correct.

12     Q      Who, within Erie OCY, makes the decision

13  that the civil service should be asked for the

14  competitive list for caseworkers?

15     A      It probably varies, but oftentimes the

16  person who would make that list -- that request, it

17  could be another administrator, who might have a

18  vacancy in their program.

19     Q      And when you or another administrator has

20  decided that it might be best to obtain one of the

21  merit civil service lists, do you make that contact

22  with civil service directly, or ask someone else in

23  OCY to make that request?

24     A      I ask someone else to make that request.

25     Q      And typically, where would that request go

1  in the agency?

2      A      To Patrice Berchtold.

3      Q      And we will speak to her later, so we will
4  leave it at that.

5             Now, how do you then get word back; does an
6  actual list come back to you, after it's been issued,
7  so you have the list to look at?

8      A      Yes, uh-huh.  Yes.

9      Q      And what thought process, would you -- do
10  you go through, when you get a competitive civil
11  service list?

12            You are looking at this list, and you know
13  you have one or more slots.  What sort of factors are
14  you looking at, when you look at that list?

15     A      I am looking at the number of people that
16  are available to be interviewed.

17            And, thinking in my head, you know, do we
18  have enough people that are interested and available
19  for hire, to fill the vacancies that we have.

20     Q      And do you then indicate to other people
21  which individuals you want to be brought in to be
22  interviewed, or do you set up the interviews yourself?

23     A      It is pretty prescribed.

24     Q      It is pretty cut and dried?

25     A      yes.

1    Q    You have to follow the Rule of 3?

2    A    Absolutely.

3    Q    So it is really just, "Well, get these

4  people"?

5    A    Well, you know, depending on the number of

6  vacancies, the top three, the top six, the top nine,

7  whatever.

8    Q    And would it be accurate, that until those

9  people are contacted, you are not sure if, as of that

10 day, that they still want the job?  You don't know how

11 up to date their interest is, as expressed on the

12 list?

13    A    Correct.

14    Q    So, it would be the case that sometimes you

15 contact people and learn that they have gone on to

16 other things, or lost interest in doing that job?

17    A    Correct.

18    Q    Okay.

19         And then you move down through the list, in

20 order, using the various requirements that you are

21 obligated to follow?

22    A    Well, again, not to get too technical but,

23 you know, when we set up interviews, we already know

24 who is available.  So that --

25    Q    Is that essentially the first question you

```
 1   ask somebody, when you call, "Do you still want to do

 2   this?"

 3       A       There is a survey that is sent out, and

 4   people respond that they are available, that they want

 5   to wait for the position, or some people don't

 6   respond, or some people's addresses are not correct,

 7   or whatever.

 8               So that by the time we set up positions --

 9   or, I'm sorry, interviews, we know whether or not the

10   people are available for hire.

11       Q       Are there part-time caseworker positions?

12       A       Do we have part time?

13       Q       Here at OCY Erie?

14       A       We -- the contract allows for some

15   part-time positions.

16               Actually, job sharing positions.

17               We currently do not have any of those

18   positions available.

19       Q       Are you familiar with a -- what I believe

20   is an employee, or at least former employee, named

21   Linda Bell?

22       A       Yes.

23       Q       And is Miss Bell currently with you?

24       A       No, she is not.

25       Q       Was she hired as a caseworker at some
```

 1  point?

 2      A      Yes, she was.

 3      Q      And if you know, was that hire in the year

 4  2004?

 5      A      It's very possible that it was then.

 6             It was within the last two to three years.

 7      Q      What caused her to leave?

 8      A      My understanding is, that she wished to

 9  relocate.

10      Q      So geographically, she was going somewhere

11  else?

12      A      Yes.

13      Q      Do you recall a name Camille Carideo?

14      A      Yes.

15      Q      And did she become a caseworker?

16      A      Yes, she did.

17      Q      Is she still with you, as a caseworker?

18      A      No, she is not.

19      Q      And do you know what caused her to leave?

20      A      I believe she did not feel that child

21  welfare was for her.

22      Q      So she tried the job, and it didn't seem

23  appropriate for her?

24      A      Yes.

25      Q      Do you recall the name Angela Lawton?

1      A      Yes.

2      Q      And my understanding is, that she was

3   someone who was hired to be a caseworker in the year

4   2004; does that sound about right?

5      A      That sounds about right, yes.

6      Q      And was she someone who had been an intern?

7      A      No, she was not.

8      Q      So, was she hired off the competitive civil

9   service list?

10     A      Yes.

11     Q      And what are her job duties today?

12     A      She is a caseworker.

13     Q      And do you recall a woman named

14  Nicole Johnson?

15     A      Yes.

16     Q      And the records we have seen in the case --

17  there is no royal we -- that I saw in the case,

18  indicate that she was hired in May of 2004, as a

19  caseworker; does that sound about right?

20     A      Yes.

21     Q      Do you recall, had she been an intern, or

22  was she hired off a competitive list?

23     A      She was a student intern.

24     Q      And about how old was Miss Johnson?

25     A      Probably in her early 20's.

1    Q    Same question as to Miss Lawton?

2    A    I would say she was in her late 30's, early

3    40's.

4    Q    And do you recall hiring an intern named

5    Julia -- excuse me, hiring someone named Julia Howser?

6    A    Yes.

7    Q    And had Miss Howser been an intern?

8    A    Yes, in Allegheny County.

9    Q    Now, would you briefly walk us through how

10    that works, if an individual has been in a similar

11    sort of internship program, but it is just

12    geographically elsewhere in the state --

13    A    Uh-huh.

14    Q    -- do you assume that it's comparable, or

15    do you double check to see if their internship was

16    comparable to your own?

17    A    We double check.

18    Q    And then the individual goes through a

19    personal one-on-one interview?

20    A    Yes.

21    Q    And --

22    A    They have to provide references.

23    Q    And Miss Howser was then hired as interns

24    would be, as we have discussed today?

25    A    To the best of my recollection, yes.

1    Q    And Miss Howser is still with your

2    organization?

3    A    Yes, she is.

4    Q    And is she a caseworker?

5    A    Yes, she is.

6    Q    And about how old is Miss Howser?

7    A    In her mid 20's, I would guess.

8    Q    Do you, in your professional work, have a

9    contact person or persons at the Civil Service

10   Commission, that you turn to for advice, and to

11   discuss these hiring matters that we have been going

12   over today?

13   A    I have individuals.  I do not do a lot of

14   direct -- I have not had the need to do a lot of

15   direct contact with the Civil Service Commission.

16   Q    And do the names of any particular contact

17   people, at the Commission, come to mind, that you have

18   worked with?

19   A    Trudy.  Steve Shartle.  Ned Shear, who is

20   no longer at the Civil Service Commission.

21   Q    You mentioned someone named Trudy?

22   A    Yeah.

23   Q    Do you recall the last name for her,

24   Trudy?

25   A    No, I don't.

```
1      Q      And have you dealt with a Marie Thau,

2   T-h-a-u?

3      A      I believe that I have had -- I have met

4   her.

5      Q      Did you meet her here at the agency's

6   offices in Erie?

7      A      No.

8      Q      Do you recall working with her on any

9   particular case, or situation?

10     A      No.

11     Q      And do you recall working with her relative

12  to any matter involving Mr. Dows?

13     A      No.

14     Q      Did you ever have any discussions or

15  correspondence with Mr. Steve Shartle, of the Civil

16  Service Commission, regarding Mr. Dows?

17     A      No.

18     Q      There came a time when there was a hearing

19  in Pittsburgh, regarding claims that -- primarily,

20  that per diem employees should not have been hired by

21  OCY.

22            Were you present for the hearing in

23  Pittsburgh?

24     A      No, I was not.

25     Q      Have you ever had a discussion, or
```

 1  discussions with any employee or representative of the

 2  Civil Service Commission, asking how to have an

 3  individual removed from the civil service list?

 4       A     I have not, no.

 5       Q     Are you aware of other employees, at OCY,

 6  who have had such conversations?

 7       A     Specifically, no.

 8       Q     No particular incident comes to mind?

 9             MR. McLAUGHLIN:  I place a continuing

10       objection on the record to that line of

11       questioning.

12       A     No.

13       Q     Are you aware of anyone at OCY

14  communicating with civil service regarding the removal

15  of Mr. Dows from the civil service list?

16       A     Yes.

17       Q     And which person or persons, as you

18  understand it, made contact with the Civil Service

19  Commission?

20       A     I don't know.

21       Q     But you are aware that some one or ones

22  did; is that right?

23       A     Yes.

24       Q     Did anyone from the Civil Service

25  Commission, in other words, communicate in the other

1   direction, and talk to you about how people in

2   general, or Mr. Dows, in particular, can be removed

3   from the civil service list?

4        A     No.

5        Q     Have you ever had occasion, yourself, to

6   take any steps to have an intern removed from the

7   civil service's intern list?

8        A     Removed from the list?  No.

9        Q     Because of deficiencies, or being an

10  inappropriate person for that kind of jobs, things

11  like that?

12       A     From the list, no.

13       Q     Do you know if it is possible, under the

14  civil service regulations, and procedures, to have an

15  intern removed for good cause?

16       A     I do not know that.

17       Q     So would it be fair to say that in your

18  experience at OCY Erie, you are not aware of any

19  action to remove an intern from the intern list,

20  through the civil service process?

21       A     Correct.

22       Q     Miss Marie Thau testified that she was one

23  of the Civil Service Commission workers that came to

24  Erie, as part of an investigation occurring in 2004

25  and 2005.

1          Do you recall that?

2     A     I believe that occurred just prior to my

3  taking over the human resources position.

4          While I knew that individuals from Civil

5  Service Commission were coming, I was not a part of

6  that process.

7     Q     So you were not interviewed by those

8  people?

9     A     No, I was not.

10    Q     Did they make any requests of you, for

11 written statements, or positions expressed in writing?

12    A     For me individually?  No.

13    Q     Do you recall either Miss Debbie Liebel, or

14 Mrs. Colleen Locke, indicating in 2004 that there were

15 problems filling caseworker positions; that they just

16 weren't able to get enough people?

17    A     No, I don't recollect that conversation.

18    Q     Have you ever had occasion to work with

19 a -- in a collegial, back and forth way, with a man

20 named Benito Martinez, who works at the Civil Service

21 Commission?

22    A     No.

23    Q     The same question about a man named

24 Karlos DelToro?

25    A     No.

```
 1      Q      Are you familiar with an individual who
 2  works with intern programs, named Robin Baumgardner?
 3      A      No.
 4      Q      Now, Mr. DelToro, of the Civil Service
 5  Commission, in a deposition mentioned that there exist
 6  management directives, that's his phrase, that provide
 7  some guidance about how to manage the programs we have
 8  been talking about today.
 9      A      Student intern?
10      Q      Yes.
11      A      Uh-huh.
12      Q      Are these directives made available to
13  the -- down to the agency level; in other words, OCY
14  has directives?
15      A      Yes.
16      Q      And do they come -- well, where do they
17  come from; who actually issues these directives?
18      A      The Civil Service Commission.  I mean, is
19  that what you are --
20      Q      But, is that -- there is a question in your
21  voice.
22      A      Well, I guess I am confused by the
23  question.
24      Q      In your experience, do the management
25  directives, at least sometimes, come from the
```

 1   Pennsylvania Civil Service Commission?

 2       A      Yes.

 3       Q      Did they sometimes come from the Governor's

 4   Office of Administration?

 5       A      I don't know that.

 6              Off the top of my head, I don't know that.

 7   I would have to look at them.

 8       Q      Actually --

 9       A      Individual ones.

10       Q      -- see where they came from.  Okay.

11              In a context of the Pennsylvania Civil

12   Service, are you familiar with the phrase an

13   evaluation guide?  They use it as a term of art

14   sometimes.

15       A      As a term of --

16       Q      -- of art in their field, an evaluation

17   guide?

18       A      I am not familiar with that specific term,

19   no.

20       Q      And in testimony, they explained that the

21   evaluation guide will apply to a specific job

22   classification, so that it provides guidance as to how

23   to analyze a person's appropriateness for a specific

24   job.

25              Do you recall running into materials that

1    sound like that, from the Civil Service Commission?

2        A      In terms of job qualifications?

3        Q      Yes.

4        A      Or performance?

5        Q      It would be looking at the appropriateness

6    of an individual, based on his or her history, for a

7    particular job.

8        A      Okay.  Yes.

9        Q      So you have seen documents to that effect?

10       A      Yes.  Over my 30 years of experience there,

11   yes.

12       Q      Over the decades?

13       A      Yes.

14       Q      And you believe that at least some of them

15   came from the Civil Service Commission?

16       A      I would say the majority of them come from

17   the Civil Service Commission.

18       Q      In the year 2004, do you recall advising

19   individuals, who are hoping to be hired as

20   caseworkers, that they should add to their paperwork

21   that they were willing to be part-time workers?

22       A      No.

23       Q      Do you currently have part-time

24   caseworkers?

25       A      No.

1    Q    In the year 2004, did you have a few

2  part-time caseworkers?

3    A    I don't recollect.

4    Q    Recall.  Okay.

5         Now, you mentioned earlier, that job

6  sharing, which is slightly different --

7    A    Uh-huh.

8    Q    -- is covered in the collective bargaining

9  agreement?

10    A    Uh-huh.

11    Q    But does the collective bargaining

12  agreement provide for also permanent part-time

13  employees?

14    A    Off the top of my head, I don't know.  I'd

15  have to reference the contract.

16    Q    Miss Angelo Lawton was hired by OCY about

17  the time Mr. Dows was not.

18         Does it sounds about right to you, that she

19  was approximately 37 years of age at that time?

20    A    I would think that could be accurate, yes.

21    Q    Could you identify Paul Concella; who was

22  he?

23    A    He was a former employee, long-term

24  employee of this organization.

25         The last position he held here was the

1  director of professional services.  But has held many

2  positions over the course of his employment with the

3  organization.

4      Q     Approximately when did Mr. Concella leave

5  the organization?  And to make that --

6      A     February -- I believe it was February of

7  '05.

8      Q     And do you know where he went to work after

9  that?

10     A     No, I don't.

11     Q     Do you know if he resides in or around

12  Erie, Pennsylvania?

13     A     I believe he does.

14     Q     Do you know a woman named Jessica Clark?

15     A     Yes, I do.

16     Q     And is she an individual who participated

17  in the internship program?

18     A     Yes.

19     Q     And was then hired to be a caseworker 2?

20     A     Yes.

21     Q     And about how old is Miss Clark?

22     A     In her mid 20's.

23     Q     Would you identify a woman, who I believe

24  is an OCY employee, named Christy Holden?

25     A     Yes.  She is the training supervisor.

1    Q    And has she held that position for several

2  years, then?

3    A    Yes.  For -- well, for about two to three

4  years.

5    Q    Do you know a person named

6  Christina Kirkpatrick?

7    A    Yes.

8    Q    And who is she, please?

9    A    She is currently an intake specialist, at

10  the agency.

11    Q    Now, is that a whole separate job category,

12  from being a caseworker, or is that a subset of being

13  a caseworker?

14    A    It is considered a promotional opportunity,

15  within the caseworker ranks.

16    Q    If you recall, had Miss Kirkpatrick

17  previously been a caseworker?

18    A    Yes.

19    Q    And had she gone through the training

20  program?

21    A    The intern?

22    Q    The intern program?

23    A    No.

24    Q    And about how old is Miss Kirkpatrick?

25    A    Mid 20's, would be my -- again, this is

```
 1  all --
 2       Q    Sure, it is just based on observations?
 3       A    Right.  Uh-huh.
 4       Q    Behavior, appearance, that sort of thing?
 5       A    Uh-huh.
 6       Q    And do you know a Miss Cindy Pearson?
 7       A    Yes.
 8       Q    And who is she, please?
 9       A    She is also an intake specialist.
10       Q    Had she previously been a caseworker 2?
11       A    Yes.
12       Q    And had she gone through the intern
13  program?
14       A    Yes.
15       Q    Successfully?
16       A    Yes.
17       Q    And, do you recall which college she came
18  from?
19       A    Edinboro.
20       Q    About how old is Miss Pearson?
21       A    Late 30's to mid 40's.
22       Q    Now, this raises a question, that came to
23  mind.
24            You said that one of the colleges, and I
25  believe it was Edinboro, but please correct me if I
```

 1  have got the wrong one, asks for a very formal
 2  commitment from the students, that they have some
 3  additional commitment, or paperwork, as to the
 4  student's absolutely guaranteeing that they will work,
 5  or that they will go into this field; does that
 6  refresh your memory?
 7      A      It refreshes my memory.
 8      Q      Yes.
 9      A      I am not certain your presentation is
10  accurate.
11      Q      Right.  So if you would present that in
12  your own words, that you feel is accurate.
13             What are they promising to do?
14      A      They are promising to work in the field of
15  child welfare for one year following graduation, in
16  return for their stipend and academic scholarship that
17  they receive.
18      Q      Do you know if they fail to do that, do
19  they then owe the money back to the school?
20      A      Yes, that's my understanding.
21             It's not to the school.
22      Q      But to the funding source?
23      A      yes.
24      Q      As part of your professional duties, did
25  you ever have occasion to review, or provide a second

1  opinion, regarding Mr. Dows' work, during the time

2  that he worked for OCY?

3      A     Yes.

4      Q     And how did that come up for you?  If you

5  would think about how you became involved, what was

6  your involvement?

7      A     Mr. Dows was a caseworker within a clinical

8  unit of which I had programmatic responsibility for.

9      Q     And then, how did you have occasion to

10 personally comment on his work, whether it was orally,

11 or in writing?

12     A     Through reports from his direct clinical

13 supervisor, as well as the training supervisor, who

14 also reports to me, as well as concerns that were

15 voiced to me by other staff members.

16     Q     There came a time when Mr. Dows left the

17 employment of the agency for good.

18           Were you involved in the decision to ask

19 him to leave, the last time he left?

20           To refresh your memory, Mr. Dows worked two

21 different times.

22     A     Yes, I do recall that.

23     Q     Were you involved at all in the second, the

24 end of his -- his second period of employment?

25     A     To some extent.

```
 1      Q      And what involvement did you have?
 2      A      I was in the -- my current position, as
 3 director of human resources, and my recollection is
 4 that the agency did not ask Mr. Dows to leave at that
 5 point in time.
 6      Q      Did -- as far as you know, did the agency
 7 request him to leave later?
 8             In other words, did there come a time where
 9 the agency finally took the position that it wanted
10 Mr. Dows to leave, period?
11      A      My recollection is that Mr. Dows was
12 employed and working, there was some litigation that
13 occurred, and that as a part of that litigation,
14 Mr. Dows' employment was terminated.
15             But that litigation was not initiated by
16 the Office of Children and Youth.  It was all
17 initiated by Mr. Dows.
18             And the -- his relationship with the
19 agency, and the county, ceased at that point in time.
20      Q      Were you involved in any negotiations
21 having to do with that final departure of Mr. Dows?
22      A      I was not.
23             MR. TAGGERT:  Citizens, can I just take a
24      one minute break with Mr. Dows?
25             (Recess taken.)
```

1  BY MR. TAGGERT:

2      Q      You had mentioned having a contact person

3  named Trudy

4      A      yes.

5      Q      Can you recall what department she was in,

6  or last name, or something that would help us figure

7  out who she was?

8      A      I do not, in my position, have a lot of

9  direct contact with civil service.

10             I believe she may be a part of county

11  programs.

12      Q      And the same question, there was a person

13  named Allen?  All you could remember was the first

14  name Allen.

15      A      That was at Edinboro University.

16      Q      Yes.  Was he a professor?

17      A      Yes, he is a professor, he is actually the

18  director of field, and his last name still -- Turner.

19      Q      So, it would be Allen Turner, a professor

20  in the social work department?

21      A      Yes.

22      Q      Now, did an individual named earlier,

23  Sue Deveney, did she ask you to make an effort to

24  remove Mr. Dows from the civil service list?

25      A      No.

1    Q    Did she discuss with you the pros and cons

2  of asking that Mr. Dows be removed from the list?

3    A    No.

4    Q    Now, sometimes, and for the sake of

5  protecting -- not burdening the record, and I hope we

6  won't go into chunks of the county budget, it can be a

7  difficult trip, there are places in the 2004, 2006

8  budgets, it is no mystery, I just couldn't find the

9  2005 budget, where in the children service line items,

10  it would occasionally have amounts for part-time

11  workers.  You know, it lists a budget amount.

12            In certain job categories, are there

13  part-time workers at Children and Services?

14    A    I believe, from time to time, there might

15  be.

16    Q    But it's very -- it is relatively rare,

17  relatively few people are part time?

18    A    Relatively rare.

19    Q    Can you identify a person named

20  Fran Gansor?

21    A    Gonsor?

22    Q    Excuse me.

23            What is the proper spelling of her name?

24    A    G-o-n-s-o -- wait a second.

25            S -- I have to write it.  G-o-n-s-o-r --

 1  s-o-r.  Yes, Gonsor.  G-o-n-s-o-r.

 2      Q      And who is Fran Gonsor?

 3      A      This is Francis, it is a male.

 4      Q      Okay.

 5      A      And I believe his title is manager of

 6  accounting.

 7      Q      Here at OCY?

 8      A      Yes.

 9      Q      And does he still hold that position?

10      A      Yes.

11      Q      And would you identify a Clair Gardina?

12      A      She works in our fiscal department.

13      Q      And --

14      A      I don't know her specific title, off the

15  top of my head.

16      Q      You had mentioned that there are persons in

17  the Civil Service Commission who have responsibilities

18  specific to county programs.

19      A      Yes.

20      Q      Is there a particular person, or persons,

21  that you have dealt with over the years?

22      A      Again, in my current position, I don't have

23  a lot of direct contact with the Civil Service

24  Commission.

25      Q      Right.

```
 1              But do you recall any names of the people
 2   that your human resources department reaches out to,
 3   at the Pennsylvania Civil Service Commission?
 4        A    I believe I have mentioned those names.
 5        Q    So no additional names come to mind?
 6        A    Off the top of my head, no.
 7        Q    And nobody, that you particularly think
 8   that is an expert in the county programs?
 9        A    I think I have answered.  I mean, I --
10        Q    If you feel you completely explored it?
11        A    I don't think I have any more information,
12   that I can share with you.
13        Q    Well, you can't tell us, what just didn't
14   appear?
15        A    Right.
16        Q    In your experience, over, say, the last ten
17   years, every year is OCY trying to hire at least some
18   caseworkers?
19        A    We have probably had some positions open,
20   yes.
21        Q    Do you have any knowledge as to how the
22   Civil Service Commission evaluates the applications
23   they receive, for county social casework intern?
24        A    Not specifically.
25              I mean, I know that they look at their
```

    1   transcripts, the course work, other volunteer
    2   experiences, or if they had some work experiences.
    3           Beyond that, I know nothing more.
    4       Q   If you know, does civil service invite
    5   people from outside the Commission to help evaluate
    6   the applications that people make?
    7       A   I don't know that.
    8       Q   Does OCY maintain, here in the building,
    9   the actual applications to be an internship candidate?
   10       A   I believe we do.
   11       Q   Do you sometimes receive direct contacts
   12   from people wanting to obtain the forms, and apply to
   13   be an internship candidate?
   14       A   Yes.
   15       Q   But based on your earlier testimony, the
   16   main origins come through the colleges and
   17   universities; that's where most of them come from?
   18       A   Well, I mean, we -- I -- you know, I have
   19   students who have called me personally, and expressed
   20   an interest, I believe Patrice Berchtold has had
   21   individuals who have inquired, I believe that probably
   22   casework staff generally, some of our management
   23   staff, people who know that we work, what we do, and
   24   have -- you know, people are interested in whether or
   25   not we have an intern program.

1              So I think there are a variety of people,
2    who express interest that way.
3              They may not all follow through with the
4    process.
5        Q     Is there any mechanism, of which you are
6    aware, for an individual, who wants to be a trainee,
7    under the program we have discussed, the internship
8    program --
9        A     Because there is no trainee category.
10       Q     Internship.  -- for an individual to get
11   into that program, except through the mechanisms we
12   have already described, where an individual is a
13   college junior or senior?
14       A     Could you rephrase the question?
15       Q     Sure.
16       A     I am not certain I am following you.
17       Q     Let's use a hypothetical.
18       A     Okay.
19       Q     Assume someone has a strong interest in
20   social work --
21       A     Uh-huh.
22       Q     -- but is some years out of college, and
23   has done other things --
24       A     Uh-huh.
25       Q     -- and now, on his or her own time --

 1      A       Uh-huh.

 2      Q       -- would like to participate in an

 3   internship program.

 4              Is there any mechanism for somebody to get

 5   in?

 6      A       Not to my knowledge.

 7      Q       Referencing now, and if need be, we will

 8   put it in the record, but first let's see if we can

 9   protect the record from getting too thick, looking at

10   the portion of the county budget for the year 2000,

11   that relates to OCY, and there are -- there is s

12   category called intake specialist trainee.

13              Does that have anything to do with the

14   kinds of training programs we have talked about today?

15      A       In terms of a student intern program?

16      Q       Yes.

17      A       No.

18      Q       Do you know what the main source is of

19   income for OCY?  The main four or five sources, of

20   where money comes from?

21      A       State, fed and local tax dollars.

22      Q       And does most of the state's money flow

23   through the Department of Public Welfare?

24      A       It is my understanding.

25      Q       Are you aware of any particular contact

1 person, for OCY, with the Department of Public

2 Welfare?

3        A        In relation to --

4        Q        Any of the programs.

5                In other words, there seems to be a bit of

6 a consensus, among the various people deposed, that

7 most of the money for OCY activities, was to various

8 programs administered by the Pennsylvania Department

9 of Public Welfare.

10        A        Uh-huh.

11        Q        For E, for D, for --

12        A        Uh-huh.

13        Q        Are you aware of any particular person, who

14 is sort of responsible for your account; in other

15 words, somebody who is the contact person for OCY

16 Erie, to talk to?

17        A        For funds?

18        Q        In Harrisburg, about funding issues, or

19 organizational issues, or application issues; are you

20 aware of any particular person to deal with?

21        A        I don't essentially deal with the budget,

22 so, you know, if you are asking a contact person,

23 regarding funding, I don't know anyone.

24                MR. TAGGERT:  Well, thank you, very much.

25                Now, other folks may have questions.

```
 1              MS. LLOYD:  I have a few follow up
 2         questions.
 3              THE WITNESS:  Okay.
 4                        EXAMINATION
 5    BY MS. LLOYD:
 6         Q    You had mentioned, several names of civil
 7    service employees, that you have spoken to in the
 8    past.
 9              Did you speak to any of these people
10    specifically about Mr. Dows, the hiring of him by OCS,
11    or his -- anything that you recall?
12         A    I -- not that I recall, no.
13         Q    Did you ever direct anyone, at OCY, to call
14    an employee of the Civil Service Commission,
15    specifically with questions about Mr. Dows' situation,
16    that you recall?
17         A    Personally, I don't recollect doing that.
18         Q    Are -- just to make this clear for me, are
19    all of the student interns off the civil service list,
20    CWEB interns?
21         A    No.
22         Q    Just those that come from Edinboro?
23         A    Yes.
24         Q    Does OCY -- is OCY responsible for paying
25    any of the student interns?
```

 1      A      We choose to pay our student interns.

 2             It is not a requirement of civil service,

 3   it's highly recommended.

 4      Q      And to my understanding, that OCY does not

 5   pay these student interns, the CWEB student interns;

 6   is that correct?

 7      A      That's correct.

 8      Q      But you do pay the other interns, that you

 9   receive from other institutions?

10      A      Yes.

11      Q      And that's at the rate of $9 an hour?

12      A      I believe it's $9 an hour.

13      Q      And does that money -- if you know, does

14   that funding or money come out of the OCY budget, or

15   costs?

16      A      I believe so.  If it's reimbursed for

17   all -- as we are reimbursed for all salaries.

18      Q      Okay.

19             So for example, Mercyhurst does not pay the

20   $9 an hour?

21      A      Correct.

22      Q      Are the student interns, that you hire, or

23   have worked for you, are they here over and above your

24   normal complement of caseworker positions?

25      A      Yes.

```
 1     Q      So, hypothetically, if you have
 2  20 caseworker positions, those are filled by, I am
 3  going to say, employees of OCY, and then the student
 4  interns are over and above those 20?
 5     A      Correct.
 6     Q      However many positions you would have?
 7     A      Correct.
 8     Q      So student interns are not hired in place
 9  of caseworker 1's, 2's, 3's?
10     A      Correct.
11     Q      If a student intern, during the course of
12  an internship, is not performing satisfactorily, can
13  you terminate that internship?
14     A      Absolutely.
15     Q      And have you done that?
16     A      Absolutely.
17     Q      Now, we talked about the student intern
18  list, and just to make the record clear, the student
19  intern list, from the civil service --
20     A      Uh-huh.
21     Q      -- that list is to fill, or hire student
22  interns who are still in college, to come into your
23  program?
24     A      Correct.
25     Q      Okay.  That student intern list is not used
```

1    to hire caseworker 1's, 2's, et cetera?

2        A    Right.

3        Q    You have been asked questions about a

4    series of individuals, and I am going to go back and

5    fill in a little bit of information, if you have it.

6        A    Okay.

7        Q    Nicole Johnson?

8        A    Yes.

9        Q    Is she still employed?

10       A    Yes, she is.

11       Q    Christy Holden, you said she was a training

12   supervisor?

13       A    Yes.

14       Q    Had she been a student intern, to your

15   recollection?

16       A    She was a student intern.

17            MS. LLOYD:  I think that's all of the

18       questions I have.  Thank you.

19                        EXAMINATION

20   BY MR. TAGGERT:

21       Q    Follow up to that.

22            For the sake of this question, I'm assuming

23   that interns, because of their lack of experience,

24   just aren't as efficient as more experienced people.

25   Is that a fair assumption?

```
 1    A    I don't know that I would agree with that.
 2    Q    Okay.
 3         If you did not have the interns, would --
 4 wouldn't either the work suffer, or you would need to
 5 have more caseworkers?
 6    A    No.  I don't believe so.
 7    Q    Are you saying, the case -- the interns
 8 carry out various tasks; agreed?  During the course of
 9 their workdays?
10    A    Yes.
11    Q    And some of these tasks, if not done by
12 them, would have to be done by someone else?
13    A    The caseworkers that we currently have
14 employed.
15    Q    So those caseworkers, at best, would have
16 more work to do?
17    A    Yes.  Possibly.
18    Q    And if they could not do the work well
19 enough, or soon enough, because of the additional
20 burden, there would at least be pressure to have more
21 caseworkers?
22    A    I don't really know that I could answer
23 that question.
24         I mean, you know, it's -- I --
25    Q    But do you really want to stand by an
```

1  answer, that says that --

2          MR. McLAUGHLIN:  Object to the form of the

3      question.

4      Q    Previously, you were asked about the

5  interns, and what work they do.

6      A    Uh-huh.

7      Q    Do you believe that the interns perform

8  useful work, much of their time?

9      A    Yes.

10     Q    And that some of this work provides direct

11 client service?

12     A    Under -- yes, under highly structured

13 supervision.

14     Q    Right.  And some of it really relieves

15 other staff of some amount of work?

16     A    I guess my response to that would be, while

17 it may relieve them of some responsibilities, it also

18 carries for them additional responsibilities.

19     Q    Carries supervisory and training

20 responsibilities?

21     A    Yes.

22     Q    But as to actual tasks being carried out,

23 the program provides willing hands, who have some

24 interest in the activity, and some at least book

25 learning, that may be helpful?

 1      A      Sure.

 2             I mean -- yes.  We -- we get some benefit

 3   from the students being here, we certainly have

 4   responsibilities to the students.

 5      Q      Did the majority of the interns succeed in

 6   obtaining employment, if they requested?

 7      A      Yes.

 8             MR. TAGGERT:  Thank you, very much.

 9             MS. LLOYD:  One more follow up, to your --

10             MR. TAGGERT:  It is like a tennis match.

11             MS. LLOYD:  Just one.

12             THE WITNESS:  That's okay.

13                        EXAMINATION

14   BY MS. LLOYD:

15      Q      Questions brought to mind, how many student

16   interns do you, on an average, generally have at any

17   given time?

18      A      Usually no more than six.

19      Q      Could there be fewer than six?

20      A      Absolutely.

21             MS. LLOYD:  That's all I have.

22                        EXAMINATION

23   BY MR. TAGGERT:

24      Q      And as to the interns, you have seen that

25   figure six, that might be six in what we think of as a

1  semester, a half school year?

2      A      975 hours, is a six-month period of time.

3      Q      And do some people serve at least part of

4  their time during the summer?

5      A      Sometimes that happens, depending on when

6  they actually do their field experience.

7      Q      And you have earlier testified, that most

8  people try and have their internship experience come

9  to a conclusion pretty much coterminous with the end

10  of their senior year?

11      A      Uh-huh.

12      Q      And, but, as the civil service documents

13  show, it is possible for people to have intern time

14  while they are juniors; isn't that right?  They can?

15      A      Yes.

16      Q      But it is --

17      A      But to the best of my recollection, we have

18  not had students that have been in a junior year

19  status doing internships.

20      Q      If someone were to complete his or her full

21  number of hours as an intern, but was not yet

22  graduated from college --

23      A      Uh-huh.

24      Q      -- does that person's eligibility, if you

25  will, to be considered as a caseworker 2, is that

 1  lasting; in other words, when that person does

 2  graduate, that person can ask or apply for a

 3  caseworker 2 job?

 4      A    We can keep that in -- and again I may not

 5  be using the correct terminology at this point -- but

 6  like on a leave status, or a hold status, until

 7  graduation.

 8      Q    And then, that individual could be

 9  considered --

10      A    Yes.

11      Q    -- for a caseworker 2 job?

12      A    Uh-huh.

13           MR. TAGGERT:  I am done.

14           MS. LLOYD:  I am done.

15           MR. TAGGERT:  Thank you, very much.

16           THE WITNESS:  Okay.

17           MR. McLAUGHLIN:  You have the right to read

18      the transcript, to make sure that everything has

19      been taken down accurately, you can't change any

20      of your testimony, as I explained to you before.

21           Typically, with a qualified court reporter,

22      I advise to waive signature.  Which means you

23      won't be reading the transcript, and you will

24      trust that he has taken everything down

25      accurately.

1            Do you waive signature?

2            THE WITNESS:  Yes.

3            MR. TAGGERT:  Thank you.

4                        - - -

5            (Thereupon, at 1:12 o'clock p.m., the

6    deposition was concluded, and signature was

7    waived.)

8                        - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        CERTIFICATE

2    COMMONWEALTH OF PENNSYLVANIA, )
                                   )  SS:
3    COUNTY OF ALLEGHENY.          )

4         I, Eugene C. Forcier, do hereby certify that
     before me, a Stenographer-Commissioner in and for the
5    Commonwealth aforesaid, personally appeared
     CHARLENE KOLUPSKI, who then was by me first duly
6    cautioned and sworn to testify the truth, the whole
     truth, and nothing but the truth in the taking of her
7    oral deposition in the cause aforesaid; that the
     testimony then given by her as above set forth was by
8    me reduced to stenotypy in the presence of said
     witness, and afterwards transcribed by means of
9    computer-aided transcription.

10        I do further certify that this deposition was
     taken at the time and place in the foregoing caption
11   specified, and was completed without adjournment.

12        I do further certify that I am not a relative,
     counsel or attorney of either party, or otherwise
13   interested in the event of this action.

14        IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Pittsburgh,
15   Pennsylvania, on this _6th_ day of _March_,
     2005.

16

17

18   Eugene C. Forcier
     Stenographer-Commissioner

19

20                        - - -

21

22

23

24

25
```

## LAWYER'S NOTES

| Page | Line | |
|------|------|---|
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |
|  |  | |

Case 1:04-cv-00341-SJM    Document 26-8    Filed 04/24/2006    Page 47 of 51

David A. Dows v.                                                    Charlene Kolupski
Katherine E. Holtzinger Conner, et al.                            February 24, 2006

## $

**$9** 31:3;85:11,12,20

## 0

**05** 70:7

## 1

**1** 20:22;21:21;28:6,18;
38:24
**1:12** 93:5
**120** 51:1,8,14,23;52:1,23
**18** 51:14
**1988** 40:12,16;41:18
**1's** 22:3,25;23:4;27:22,25;
86:9;87:1

## 2

**2** 21:7;22:8,21;23:2;28:3,
6,9,14,18,19;31:18,21,24;
32:6,10;36:20;37:3,10;
70:19;72:10;91:25;92:3,11
**20** 8:4,9;24:25;51:21;86:2,
4
**2000** 82:10
**2004** 6:4;34:9;58:4;59:4,
18;64:24;65:14;68:18;
69:1;77:7
**2005** 5:25;6:2;64:25;77:9
**2006** 77:7
**20's** 59:25;61:7;70:22;
71:25
**2's** 21:18;22:3,24;27:23;
32:12,18,22;38:13;40:5;
51:23;53:9,22;54:7;86:9;
87:1

## 3

**3** 42:10,16;45:2;56:1
**30** 12:2;19:4,4;68:10
**30's** 60:2;72:21
**37** 69:19
**3's** 86:9

## 4

**4** 5:25
**40's** 60:3;72:21

## 5

**5** 5:25
**50** 21:11,16
**50/50** 19:25

## 7

**75** 21:12

## 9

**975** 12:9,12;26:21,25;91:2

## A

**able** 13:16;25:1;27:3;
33:1;36:24,24;41:15;65:16
**above** 85:23;86:4
**absolutely** 73:4
**Absolutely** 20:9;56:2;
86:14,16;90:20
**abuse** 5:15
**academic** 17:20;30:4;
43:25;73:16
**accept** 10:21
**acceptable** 3:15
**accepted** 31:10
**access** 38:21
**accommodate** 47:13
**account** 83:14
**accounting** 78:6
**accurate** 15:3;16:22;
56:8;69:20;73:10,12
**accurately** 92:19,25
**acronym** 11:13
**action** 34:7;64:19
**activities** 43:7
**activity** 10:7;17:22;52:18;
89:24
**actual** 49:24;55:6;80:9;
89:22
**actually** 8:8,15;13:11;
16:18;26:25;41:24;43:25;
45:5,5;46:14;50:9;66:17;
76:17;91:6
**Actually** 57:16;67:8
**add** 68:20
**added** 51:4
**addition** 6:22;12:21
**additional** 9:7;11:24;
19:10;24:13;51:3,8;73:3;
79:5;88:19;89:18
**additionally** 48:18
**Additionally** 26:20
**address** 47:25
**addresses** 57:6
**adequately** 20:18;37:20
**administered** 83:8
**Administration** 67:4
**administrator** 54:17,19,
11,19
**advanced** 51:10;52:10,
11,19
**advantage** 53:8,23
**advice** 61:10
**advise** 92:22
**advising** 68:18
**advisor** 14:13
**again** 19:6;20:15;29:24;
39:25;40:17,22;45:17;
47:15;56:22;71:25;92:4
**Again** 6:20;18:1;29:22;

37:4;40:8;78:22
**against** 35:5
**age** 69:19
**agencies** 9:16;10:21;
41:2,11;42:6,7;47:14
**agency** 3:7;5:4;6:7,14;
7:11;8:9,10,12,15,24;
18:13;20:14,25;23:24;
25:14;26:2,11,12,22;49:3,
20;55:1;66:13;71:10;
74:17;75:4,6,9,19
**agency's** 62:5
**ages** 20:7
**aging** 42:7
**ago** 8:9;35:21
**agree** 3:15;20:88:1
**agreed** 88:8
**agreeing** 12:12
**agreement** 49:12
**ahead** 45:7;53:15
**alleged** 34:25;35:7
**Allegheny** 12:25;60:8
**Allen** 14:22;76:13,14,19
**allow** 35:12
**allowed** 44:21;45:4
**allows** 57:14
**always** 9:4;17:23;39:24;
53:15
**among** 18:9;83:6
**amount** 30:17;77:11;
89:15
**amounts** 77:10
**analyze** 67:23
**and/or** 11:7;39:4
**Angela** 58:25
**Angelo** 69:16
**answered** 7:24;79:9
**appeal** 31:11
**appear** 36:17;79:14
**appearance** 72:4
**appeared** 43:3
**appearing** 3:6.11
**appears** 44:3
**applicable** 42:3
**application** 9:10;15:23,
25;17:1,4;83:19
**applications** 79:22;80:6,
9
**apply** 42:22;44:1;67:21;
80:12;92:2
**applying** 45:13
**approach** 15:17
**appropriate** 3:18;24:8;
40:1;58:23
**appropriateness** 67:23;
68:5
**approximately** 19:4;
41:18;69:19
**Approximately** 70:4
**area** 10:19;42:7
**around** 70:11
**arrived** 8:12
**art** 67:13,16

**aspect** 46:24
**aspects** 46:14
**assigned** 3:12
**assimilating** 24:19
**assist** 41:2
**assistantship** 30:5
**assume** 5:24;27:3;60:14
**Assume** 81:19
**assuming** 4:10;53:13;
87:22
**assumption** 87:25
**attach** 17:2,3
**attempt** 41:1
**attend** 49:21
**attended** 44:22
**attending** 53:1
**attitude** 22:16
**Attorney** 3:3,6;7:6
**authorities** 23:13
**available** 9:15;16:14,18;
24:15;29:18;42:11;47:21;
55:16,18;56:24;57:4,10,
18;66:12
**average** 90:16
**aware** 3:4,5;7:1,10,13;
9:14,17;13:22;14:15;
31:13;33:10;43:23;63:5,
13,21;64:18;81:6;82:25;
83:13,20

## B

**Baccalaureate** 11:14,15
**back** 39:14;40:4;46:1;
48:14;54:2;55:5,6;65:19;
73:19;87:4
**backgrounds** 20:8
**balance** 53:5
**bargaining** 38:4,7,10;
69:8,11
**based** 68:6;72:2;80:15
**basic** 52:23
**Basically** 47:10
**basis** 34:24
**Baumgardner** 66:2
**became** 54:9,10;74:5
**become** 36:20;37:17;
38:12;40:5;43:23;51:22;
52:19;53:14;58:15
**began** 8:8;9:12;53:10,11;
54:2
**begin** 8:1;9:23;22:2;
24:23;32:6;38:16
**beginning** 32:1
**begins** 54:4
**behalf** 3:6,8,21
**Behavior** 72:4
**belief** 41:18
**Bell** 57:21,23
**belong** 38:4
**benefit** 42:3;90:2
**benefits** 31:5
**Benito** 65:20

**Berchtold** 6:9
**Berchtold** 55:2;80:20
**best** 54:20;60:25;88:15;
91:17
**better** 20:13
**beyond** 12:14
**Beyond** 80:3
**big** 4:21
**bit** 83:5;87:5
**block** 19:2
**Bloomsburg** 44:6
**book** 89:24
**break** 4:19;48:14;75:24
**brief** 7:16
**briefly** 60:9
**bring** 11:20;42:14
**bringing** 42:18;44:13
**brought** 55:21;90:15
**BSW** 11:8,10
**Bucks** 45:7
**budget** 77:6,9,11;82:10;
83:21;85:14
**budgets** 77:8
**building** 80:8
**bulletin** 41:3
**bulletins** 26:12
**burden** 88:20
**burdening** 77:5
**business** 23:7

## C

**call** 12:4;30:16;42:11;
57:1;84:13
**called** 4:2;9:11;21:20;
80:19;82:12
**calls** 11:16
**came** 23:17;44:14;62:18;
64:23;67:10;68:15;72:17,
22;74:16
**Camille** 58:13
**can** 3:17;7:20;16:24;20:4,
15;22:4;26:19;29:14;
32:21;38:25;40:17;46:22;
47:15;52:20;53:5;64:2;
75:23;77:6;79:12;82:8;
86:12;91:14;92:2,4
**Can** 43:8,11;76:5;77:19
**candidate** 80:6
**capable** 24:11;25:20;
26:14
**capacity** 14:9
**careers** 17:20
**Carideo** 58:13
**carried** 89:22
**carries** 20:17;89:18
**Carries** 89:19
**carry** 88:8
**case** 3:10,13;8:17;29:6;
49:13;56:14;59:16,17;
62:9;88:7
**casework** 79:23;80:22
**caseworker** 20:22;21:3,

69:5;76:22;80:15;91:7
**early** 59:25;60:2
**economic** 53:8
**Ed** 14:1
**Edinboro** 11:10,23;
12:16;14:17,21;19:1;
29:24;30:13;72:19,25;
76:15;84:22
**education** 17:13;27:6;
28:17;50:17;51:16
**Education** 13:20
**educational** 15:24;
17:10,17
**Educational** 11:15
**effect** 53:10;68:9
**efficient** 87:24
**effort** 33:18;76:23
**either** 13:22;14:21;31:11;
38:5;65:13;88:4
**eligibility** 91:24
**eligible** 7:7
**else** 41:25;53:14;54:22,
24;58:11;88:12
**elsewhere** 60:12
**e-mail** 48:4
**employed** 34:13,14;39:2;
45:19;75:12;87:9;88:14
**employee** 4:25;57:20,20;
63:1;69:23,24;70:24;84:14
**employees** 49:14,18;
62:20;63:5;69:13;84:7;
86:3
**employers** 42:5,6
**employment** 37:23;
51:15;70:2;74:17,24;
75:14;90:6
**encountered** 27:18
**end** 20:18;23:6;40:3;
74:24;91:9
**English** 10:10
**enough** 29:17;43:15;
52:10,19;59:15;18;65:16;
88:19,19
**enter** 27:13
**entire** 5:22
**equal** 53:14,17
**Erie** 11:7;12:19;16:5;
34:16;45:6,19;54:12;
57:13;62:6;64:18,24;
70:12;83:16
**essentially** 56:25;83:21
**et** 26:24;41:14;42:17;45:3;
87:1
**evaluate** 80:5
**evaluated** 9:11
**evaluates** 79:22
**evaluation** 67:13,16,21
**even** 3:11;28:5;39:7;46:1;
53:18,20
**Even** 39:7;42:20
**events** 35:19;36:3
**eventually** 9:5;35:24;
53:13

**everybody** 11:16;41:25;
53:5
**exactly** 37:4
**exam** 27:10;28:5;41:24;
46:3,9,15,20;47:2,7,18;
48:19;49:2
**examination** 8:22;9:9;
46:21
**EXAMINATION** 4:5;84:4;
87:19;90:13,22
**example** 13:19;24:25;
27:9,18;31:14;43:11;44:5;
85:19
**except** 3:16;81:11
**exceptions** 19:9
**excuse** 60:5
**Excuse** 77:22
**executed** 35:4
**executive** 34:8,9
**exempt** 51:23;52:3,10
**exist** 92:2;66:5
**existence** 10:15
**expectations** 10:24,25
**expense** 49:8
**experience** 12:3;15:4;
17:12,18;18:3;19:3,7,12;
21:1;26:17,21,22;27:7;
28:17,22;29:4,5,7,9;45:25;
46:7,19;47:20;64:18;
66:24;68:10;79:16;87:23;
91:6,8
**experienced** 51:6;87:24
**experiences** 18:25;29:9;
80:2,2
**expert** 79:8
**expired** 39:8
**explain** 4:14;6:18
**explained** 67:20;92:20
**explored** 79:10
**express** 81:2
**expressed** 56:11;65:11;
80:19
**extended** 10:18
**extent** 74:25

**F**

**face** 42:9
**fact** 21:4;36:2
**factors** 24:3;55:13
**facts** 36:11
**factual** 40:18
**fail** 73:18
**fair** 8:20;20:3;21:24;
50:14;64:17;87:25
**fairly** 35:19;45:12
**falls** 17:23
**familiar** 57:19;66:1;
67:12,18
**far** 75:6
**February** 70:6,6
**fed** 82:21
**feel** 4:16;21:9;24:16;

44:10;58:20;73:12;79:10
**fees** 49:21
**fellowship** 30:4,6
**few** 52:11;69:1;77:17;84:1
**fewer** 90:19
**field** 15:23;18:2,16,17,21,
23,25;19:2,3,6,11;28:21;
29:2;40:25;47:18;53:21;
67:16;73:5,14;76:18;91:6
**figure** 50:21;76:6;90:25
**fill** 15:16,20;24:6,8;25:1,
15,24;29:17;41:25;55:19;
86:21;87:5
**filled** 9:10;86:2
**filling** 65:15
**final** 17:17,21,24;24;18:7,
22;19:1;75:21
**finally** 75:9
**find** 45:12;77:8
**fine** 9:4
**fired** 32:21
**first** 3:1;4:3;10:24;14:9,
11;15:5;22:19;25:1,8,15;
26:3;51:14;56:25;76:13;
82:8
**First** 33:8
**fiscal** 23:6;78:12
**fit** 47:18
**fits** 28:25
**five** 5:18;33:11;82:19
**fix** 36:24
**fixed** 30:17
**flat** 30:14
**flow** 82:22
**folks** 83:25
**follow** 42:13,16;44:18;
45:1,9;56:1,21;81:3;84:1;
90:9
**Follow** 87:21
**following** 12:18;73:15;
81:16
**follows** 4:4
**food** 50:6
**forgetting** 14:22
**form** 3:16;15:21;29:12;
35:9;39:20;46:16;89:2
**formal** 49:4;73:1
**former** 57:20;69:23
**forms** 80:12
**forth** 16:8;20:8;36:25;
65:19
**four** 82:19
**frame** 24:25
**Fran** 77:20;78:2
**Francis** 78:3
**Franklin** 49:15
**fringe** 31:5
**full** 18:12;91:20
**functioning** 31:4
**funding** 13:18;30:21;
39:13,15;73:22;83:18,23;
85:14
**funds** 23:3;83:17

**G**

**game** 53:15
**Gannon** 11:8;12:5;14:16,
20;18:15;30:23
**Gansor** 77:20
**Gardina** 78:11
**general** 64:2
**generally** 11:1;17:19,23;
23:8;28:19;41:12;45:18;
80:22;90:16
**geographically** 58:10;
60:12
**gets** 13:18;16:13
**given** 20:17;24:23,25;
90:17
**gives** 26:11,12,14;46:21
**goal** 48:20
**goes** 45:25;50:22;60:18
**G-o-n-s-o** 77:24
**Gonsor** 77:21;78:1,2
**G-o-n-s-o-r** 77:25;78:1
**good** 64:15;74:17
**Governor's** 67:3
**grade** 22:19;24:11,16;
33:1
**graduate** 92:2
**graduated** 91:22
**graduating** 22:9
**graduation** 12:18;73:15;
92:7
**great** 21:3;22:5
**greater** 9:8
**grievable** 38:25
**grievance** 38:5,21
**grieve** 38:25
**group** 25:16;26:3,4
**guaranteed** 20:20,24
**guaranteeing** 41:19;73:4
**guess** 30:6,7;46:23;61:7;
66:22;89:16
**guidance** 36:25;66:7;
67:22
**guide** 67:13,17,21

**H**

**half** 91:1
**hand** 3:10
**hands** 89:23
**happen** 41:6,6
**happened** 40:21;45:21
**happening** 27:19
**happens** 4:20;9:22;91:5
**Harrisburg** 8:18;10:3;
83:18
**head** 9:2;55:17;67:6;
69:14;78:15;79:6
**health** 26:8;42:6
**Healthcare** 31:7
**hearing** 32:21;36:14,17,
18;49:13;62:18,22

**held** 36:16;69:25;70:1;
71:1
**help** 76:6;80:5
**helpful** 89:25
**helping** 47:1
**hereinafter** 4:3
**high** 19:15;21:6,10;40:23
**higher** 53:24
**highly** 20:4;85:3;89:12
**hire** 23:16,21,22;24:16,
17;25:8;28:2,3,23;40:1;
41:13,15;47:11;55:19;
57:10;58:3;79:17;85:22;
86:21;87:1
**hired** 8:23;20:14;21:7,14,
17;22:18;24:12;25:22;
27:2;29:15;31:18;32:5;
36:2;37:10;38:15;42:11;
45:6,22;53:2;57:25;59:3,8,
18,22;60:23;62:20;68:19;
69:16;70:19;86:8
**hires** 54:10
**hiring** 9:15,19,20;28:25;
60:4,5;61:11;84:14
**history** 39:17;68:6
**Hixon** 14:21
**H-i-x-o-n** 14:22
**hold** 6:13;78:9;92:6
**Holden** 70:24;87:11
**hope** 11:4;23:22;25:1;
77:5
**hoping** 68:19
**hour** 12:2;22:25;26:25;
31:2,3;50:10,21;85:11,12,
20
**hourly** 30:23
**hours** 12:9,12;18:18,19;
19:4,4;20:12,18;26:21;
50:22,23;51:1,8,14,19,21,
23;52:1,23;91:2,21
**Howser** 60:5,7,23;61:1,6
**human** 5:8,19;6:11;65:3;
75:3;79:2
**hundreds** 50:22
**hypothetical** 22:9;81:17
**hypothetically** 86:1

**I**

**identify** 7:20;69:21;
70:23;77:19;78:11
**importance** 9:8
**improve** 37:20
**inappropriate** 64:10
**incident** 63:8
**include** 39:4
**includes** 6:25
**income** 82:19
**incomes** 53:13
**indicate** 14:10;55:20;
59:18
**indicating** 9:7;65:14
**individual** 20:19,21;23:2;

Case 1:04-cv-00341-SJM    Document 26-8    Filed 04/24/2006    Page 49 of 51

David A. Dows v.
Katherine E. Holtzinger Conner, et al.
Charlene Kolupski
February 24, 2006

much 18:12;19:15;31:1;
53:1;83:24;89:8;90:8;91:9;
92:15
Murphy 14:20
must 17:3,10
mutually 11:3
Myself 33:7
mystery 77:8

## N

name 5:4;7:19;13:23;
14:15,22;43:11;44:2;
58:13,25;61:23;76:6.14,
18;77:23
named 57:20;59:13;60:2,
5;61:21;65:20,23;66:2;
70:14,24;71:5;76:3.13,22;
77:19
names 33:14.16;34:4;
61:16;79:1,4,5;84:6
nature 12:10
necessarily 12:19;29:2,5
necessary 16:14;50:18
Ned 61:19
need 4:19;16:25;19:9;
24:24;26:23;29:1;44:3.10;
61:14;82:7;88:4
needed 25:24
needs 47:13;49:3;50:4
negative 46:13,24
negotiations 75:20
new 50:23;51:6.13
next 52:11
Nicole 59:14;87:7
nine 56:6
nobody 79:7
nontraditional 20:1.4
Nope 31:15
normal 85:24
normally 28:2.2,3
Normally 34:7
Northwest 12:24
number 3:5;18:18.19;
21:6,11;24:2,5.7,24;36:15:
55:15;56:5;91:21
Number 3:14
numbers 41:14,14

## O

object 34:21
Object 46:16;89:2
objected 35:23
objection 3:11;34:23;
35:11,14;36:5;63:10
Objection 25:10;29:12
objections 3:16
obligated 56:21
observations 72:2
observed 46:19
obtain 21:4;54:20;80:12
obtaining 90:6

occasion 23:16;33:4;
48:16;64:5;65:18;73:25;
74:9
occasionally 77:10
occurred 36:4;65:2;
75:13
occurring 64:24
occurs 17:19;42:12
o'clock 93:5
OCS 84:10
OCY 9:16;14:9;16:5;
20:19;21:3,4,14;22:19;
23:19;24:23;31:11;33:11;
34:1;35:23;37:20;49:14;
50:2;54:12,23;57:13;
62:21;63:5,13;64:18;
66:13;69:16;70:24;74:2;
78:7;79:17;80:8;82:11,19;
83:1,7,15;84:13,24,24;
85:4.14;86:3
OCY's 34:25;35:7;42:6;
49:8
off 23:17;24:21;28:1,3;
29:16;30:11;32:5,14,18;
38:15;48:11,25;49:5;
50:15;53:2,10,12;59:8,22;
78:14;84:19
Off 48:9;67:6;69:14;79:6
office 12:14;13:14;19:23
Office 4:25;5:5,23;10:17;
13:6;16:1;20:2;39:16;67:4;
75:16
offices 16:14;62:6
off-site 49:11
often 40:24
oftentimes 54:15
old 59:24;61:6;70:21;
71:24;72:20
once 22:6;23:2;27:2;
38:12;39:2,11;53:22
one 3:5;4:7,15;7:1,5,16;
9:12;10:21;12:17;19:5;
30:17;34:5;35:19;36:4,15;
48:10;53:10;54:20;55:13;
63:21;64:22;72:24;73:1,
15;75:24;90:11
One 90:9
one-on-one 60:19
ones 63:21;67:9
ongoing 6:16,18;10:18;
12:22;13:1;37:14
only 47:15
on-the-job 27:7
open 79:19
openings 24:6
opinion 36:11;40:17,20,
22;74:1
opportunity 26:13,15;
71:14
opposed 22:3;25:16;
48:25
option 27:13
orally 74:10

order 23:21;56:20
ordered 36:2
organization 5:14,22;
6:24;12:7;27:5;34:8,12;
39:25;61:2;69:24;70:3,5
organizational 29:1;
83:19
organizations 39:18,18
originated 44:8
origins 80:16
out 8:20;9:6,10;15:16,20;
20:17;23:3;25:12;25:5;27:22;
41:25;45:13;52:20;53:5;
57:3;76:7;79:2;81:22;
85:14;88:8;89:22
outside 80:5
outsider's 21:25
over 23:19;38:22;61:12;
65:3;70:2;78:21;79:16;
85:23;86:4
Over 68:10,12
overnight 50:4
owe 73:19
own 14:12;60:16;73:12;
81:25

## P

packet 16:6,11
packets 16:23;17:8
paid 13:4;22:20;23:3;
27:22;30:1,1,3;32:13;35:3;
40:3,16;49:11;53:24
paperwork 15:16;43:25;
68:20;73:3
part 10:20;11:11;16:2,10;
17:17;27:4;29:25;35:24;
38:9;41:1;44:4;51:25;52:4;
57:12;64:24;65:5;73:24;
75:13;76:10;77:17;91:3
participate 34:18;82:2
participated 70:16
participating 52:1
particular 3:17;9:23;
15:2;43:6;61:16;62:9;63:8;
64:2;68:7;78:20;82:25;
83:13,20
particularly 79:7
parties 35:5
part-time 57:11,15;68:21,
23;69:2,12;77:10,13
party 33:25
pass 13:11;30:20
past 23:20;84:8
Patrice 55:2;80:20
Paul 69:21
pay 22:19;29:20,24;31:2;
39:22;49:21,23;50:2;85:1,
5,8,19
paying 49:19;50:9;84:24
payment 30:9,24
payroll 54:5
Pearson 72:6,20

pending 48:3
Pennsylvania 12:20,24;
36:16;41:12;67:1,11;
70:12;79:3;83:8
people 8:19,22;9:9;10:2;
14:18,24;15:6;16:7;20:4,
11;21:1,12;23:16,22;25:2;
27:21;28:1,25;29:7,17;
34:5;38:8,15;40:25;41:14,
16;42:24;43:6;44:21;45:5,
7,13,18;46:1;48:24;49:2;
53:2;55:15,18,20;56:4,9,
15;57:4,5,10;61:17;64:1;
65:8,16;77:17;79:1;80:5,6,
12,23,24;81:1;83:6;84:9;
87:24;91:3,8,13
People 16:20
people's 57:6
per 22:25,25;31:2,24;
51:19;62:20
percent 21:11,12,16
percentage 21:12
perform 26:19;89:7
performance 37:3;68:4
performed 25:19
performing 17:14;86:12
performs 20:18
perhaps 43:24
period 7:16;10:18;27:1,5;
32:7,9,12;33:2;37:12;
38:22;39:8;50:15;74:24;
75:10;91:2
Period 45:10
periodically 10:23
permanent 31:25;54:10;
69:12
person 7:7;13:22;14:15;
18:12;22:18;33:11;38:1;
43:16;50:9;53:10,11;
54:16;61:9;63:17;64:10;
71:5;76:2,12;77:19;78:20;
83:1,13,15,20,22;92:1,2
personal 60:19
personally 37:8,39:10;
44:10;46:6;74:10;80:19
Personally 84:17
persons 33:12;61:9;
63:17;78:16,20
person's 37:19;67:23;
91:24
phrase 66:6;67:12
piece 41:3;43:17
Pittsburgh 14:7;36:16;
62:19,23
place 11:24;23:5;52:20;
53:6;63:9;86:8
placement 18:16;25:19
places 77:7
plaintiff 4:2
playing 53:20
please 13:25;14:2;71:8;
72:8,25
Plus 50:9

pm 93:5
point 16:10,17;35:16;
40:16;42:23;53:18;58:1;
75:5,19;92:5
poor 37:3
population 26:24
portion 50:16;82:10
portions 16:23
position 5:24;6:14,19;
13:23;20:22,24;25:15;
31:10;57:5;65:3;69:25;
71:1;75:2,9;76:8;78:9,22
positions 6:13;21:4,7;
25:2;29:18;48:17;57:8,11.
15,16,18;65:11,15;70:2;
79:19;85:24;86:2,6
positive 37:18
possibilities 20:21
possible 9:15;17:25;
28:8;40:1;58:5;64:13;
91:13
possibly 16:7
Possibly 88:17
post 10:3
postings 43:24
practical 27:21
precision 21:10
predecessor 6:5
preference 25:8;28:8,14,
23;42:3,17;44:21;45:2,4
prefield 12:3
prescribed 19:10;55:23
present 62:22;73:11
presentation 73:9
preserved 35:14
pressure 88:20
presumably 20:13
pretty 18:12;19:15;55:23,
24;91:9
previously 8:17;71:17;
72:10
Previously 89:4
primarily 18:23;62:19
prior 12:1;20:7;27:11;
35:21;36:3;41:6,18;44:12;
45:23;65:2
Prior 6:13
probably 8:4;19:25;
20:20;54:15;79:19;80:21
Probably 59:25
probation 32:13,14,19,
23;37:14
probationary 31:21;
32:3,7;37:12;38:16,21;
39:8
problem 42:9
problems 46:20;65:15
procedurally 37:21
procedure 38:5
procedures 64:14
proceed 10:10
proceedings 35:25
process 11:22;13:17;

60:5;61:21;81:19;88:12;
91:20
**sometimes** 18:5;19:8;
29:7;41:5;56:14;66:25;
67:3,14;77:4;80:11
**Sometimes** 18:4;91:5
**somewhere** 58:10
**soon** 88:19
**s-o-r** 78:1
**sorry** 6:16;20:15;57:9
**sort** 27:12;31:10;55:13;
60:11;72:4;83:14
**sound** 16:22;59:4,19;
68:1
**sounds** 14:4;59:5;69:18
**source** 39:13,16;73:22;
82:18
**sources** 82:19
**speak** 13:16;14:11,13;
26:12;47:15,19;55:3;84:9
**speaking** 23:8
**speaks** 41:3
**specialist** 71:9;72:9;
82:12
**specific** 67:18,21,23;
78:14,18
**specifically** 17:1;34:3;
36:13;79:24;84:10,15
**Specifically** 63:7
**spell** 14:2
**spelling** 77:23
**spoken** 84:7
**staff** 6:16,23;26:7;51:6,
13;74:15;80:22,23;89:15
**stand** 88:25
**standards** 23:25;25:14;
47:5
**start** 15:19;27:21;52:1
**started** 8:15;53:20
**starting** 53:9
**Starting** 23:1
**starts** 50:16
**state** 3:9;11:12;13:10;
49:17,18,19;50:20,25;
51:5,7;60:12
**State** 44:6;82:21
**statements** 65:11
**state's** 82:22
**status** 22:8;31:21,25;
32:3;38:16,19;91:19;92:6,
6
**stem** 34:7
**steps** 15:14;25:24;37:2;
64:6
**Steve** 61:19;62:15
**still** 6:7;18:11;25:23;30:1,
19,20;46:3;49:3;56:10;
57:1;58:17;61:1;76:18;
78:9;86:22;87:9
**stipend** 13:10;30:4;73:16
**stipulation** 3:14
**stipulations** 3:2
**stories** 20:5;49:13

**straight** 19:16
**stream** 30:21
**strong** 44:7,24;81:19
**structured** 89:12
**student** 6:25;7:2;8:4,16;
9:18,19,20;10:21;11:4;
16:7;18:10;19:9;20:17;
24:7;25:18;26:5;27:15;
29:20;31:23;39:17,22;
40:13;42:12,14,20,21,25;
43:23;44:1;45:23;59:23;
82:15;84:19,25;85:1,5,5,
22;86:3,8,11,17,18,21,25;
87:14,16;90:15
**Student** 66:9
**students** 9:23,24;10:4,6,
15,24;11:20,22,25;12:6,9,
16;15:4,10;17:7,13;18:15;
19:13,14,14,18;20:2;
24:10,15;25:21;29:25;
30:13;41:20;42:2,22;43:3;
44:8,12,16;45:22;73:2;
80:19;90:3,4;91:18
**student's** 39:20;73:4
**style** 41:21
**subject** 7:8;32:7;37:25
**subjects** 7:2
**subset** 71:12
**succeed** 29:10;32:14;
90:5
**successful** 21:5;31:22;
36:23;37:7;40:4
**successfully** 20:12;21:2,
14;22:7;36:22;46:2
**Successfully** 72:15
**Sue** 7:22;76:23
**suffer** 88:4
**suggest** 48:17
**suggested** 17:6
**suggestively** 32:20
**sum** 30:14;32:13
**summer** 91:4
**supervised** 7:17
**supervision** 89:13
**supervisor** 5:17;7:21;
70:25;74:13,13;87:12
**supervisors** 37:16
**supervisory** 89:19
**support** 36:12
**sure** 24:19;56:9;92:18
**Sure** 20:16;22:1;72:2;
81:15;90:1
**survey** 57:3
**sworn** 4:3,23
**system** 12:8;18:6,7;
20:12;23:12;36:22;40:23;
46:12

**T**

**TAGGERT** 3:1;4:6;25:12,
13;35:16;36:7;46:18;
48:13;75:23;76:1;83:24;

87:20;90:8,10,23;92:13,
15;93:3
**talk** 7:7;10:23;64:1;83:16
**talked** 8:18;15:5,7;82:14;
86:17
**talking** 19:21;41:12;66:8
**tasks** 88:8,11;89:22
**tax** 82:21
**teaching** 49:25
**technical** 56:22
**ten** 79:16
**tennis** 90:10
**term** 67:13,15,18
**terminate** 37:23;86:13
**terminated** 33:2;75:14
**termination** 39:5,7
**terminology** 92:5
**terms** 11:1;28:16;35:5;
48:23;68:2;82:15
**test** 40:11;41:9,22;48:3,6
**testified** 64:22;91:7
**testify** 36:17
**testimony** 67:20;80:15;
92:20
**testing** 23:10
**Thau** 62:1;64:22
**T-h-a-u** 62:3
**therefore** 44:9
**Thereupon** 93:5
**thick** 82:9
**thinking** 55:17
**though** 3:11
**thought** 7:6;55:9
**three** 6:21;11:6;12:21;
14:16;18:9;19:12,21;56:6;
58:6;71:3
**times** 29:15;40:24;41:11;
48:21;74:21
**title** 5:7;78:5,14
**today** 4:8,19;6:9;7:2,7;
31:17;43:2;59:11;60:24;
61:12;66:8;82:14
**together** 16:18;28:13;
47:6
**took** 75:9
**top** 56:6,6,6;67:6;69:14;
78:15;79:6
**topic** 38:25
**totally** 25:4
**tough** 35:6
**toward** 49:21
**tracing** 13:13
**track** 27:13
**traditional** 19:13;20:1
**train** 39:25
**trainee** 25:2,16;26:3;
53:11,12,15,22,23;81:6,9;
82:12
**trainees** 25:8;53:9;54:2,
10
**trainers** 49:24
**training** 22:13;27:1,6,11,
14;31:17;43:1;49:4,16,17,

19,23;50:12,23;51:2,4,5,6,
7,8,9,10,14,24;52:1,3,5,7,
9,11,13,14,18,23;53:1;
70:25;71:19;74:13;82:14;
87:11;89:19
**trainings** 49:9;52:20
**transcript** 92:18,23
**transcripts** 80:1
**travel** 50:2
**Travel** 50:3
**tried** 52:23
**trimester** 18:6,21,22
**trimesters** 18:8
**trip** 77:7
**truancy** 5:14
**Trudy** 61:19,21,24;76:3
**trust** 92:24
**try** 15:11;17:13;21:10;
37:21;91:8
**trying** 24:20;30:11;43:8,
20;47:6,13,25;79:17
**tuition** 49:21
**turn** 7:23;61:10
**turned** 8:20
**Turner** 76:18,19
**turning** 29:16
**turnover** 40:24
**turns** 9:6
**two** 3:7,14;5:13;18:4,7;
28:13;31:1;35:19;53:4;
58:6;71:3;74:20
**type** 8:23;11:4;26:15,22;
28:25;34:7
**types** 10:24
**typically** 10:3;27:25;
52:9;54:25
**Typically** 92:21

**U**

**under** 13:2;22:20;28:5;
35:22;38:1;42:10;64:13;
81:7;89:12
**Under** 89:12
**union** 38:20
**unit** 5:15,15;7:19,21;38:4,
7,10;74:8
**units** 5:14,16,17,18;6:21;
7:17
**universities** 11:7;12:22,
23;43:7;80:17
**university** 11:10;14:7;
76:15
**University** 11:10;14:7;
76:15
**unpaid** 39:19
**up** 19:20;21:10;44:11,17;
45:15;50:17;55:22;56:11,
23;57:8;74:4;84:1;87:21;
90:9
**upon** 31:22;39:11
**Upon** 21:5
**use** 12:8;22:9;30:23;
67:13;81:17

**used** 10:14;23:25;50:17;
86:25
**useful** 89:8
**using** 56:20;92:5
**usually** 17:17;18:11;
51:10
**Usually** 17:21;52:6;90:18

**V**

**vacancies** 24:6,9,10,13;
41:15;55:19;56:6
**vacancy** 25:20;54:18
**varies** 14:14;54:15
**variety** 81:1
**various** 9:12;49:4;56:20;
83:6,7;88:8
**vary** 29:22
**version** 42:25
**veterans** 42:3,17;45:2
**viewpoint** 21:25;39:21
**voice** 66:21
**voiced** 74:15
**voluntarily** 37:22
**volunteer** 80:1

**W**

**wait** 57:5;77:24
**waive** 92:22;93:1
**waived** 3:17;35:15;93:7
**walk** 60:9
**wants** 16:5;81:6
**Warren** 49:14
**way** 3:14;4:9;7:15,20;
14:4;19:10;34:18;35:9;
46:25;48:19;65:19;81:2
**week** 18:18,19;19:4
**welfare** 12:17;26:7,9;
29:3,5;40:23;46:23;47:16;
58:21;73:15
**Welfare** 11:14,15;13:19;
82:23;83:2,9
**weren't** 40:3;65:16
**what's** 4:14;32:17
**What's** 40:20
**whole** 71:11
**willing** 68:21;89:23
**wind** 19:20
**wish** 14:8
**wished** 58:8
**wishes** 15:15;20:18
**withdraw** 25:12
**within** 5:14;6:24;13:23;
20:25;31:11;34:1;48:5;
51:14;54:12;58:6;71:15;
74:7
**without** 32:21
**witness** 4:2
**WITNESS** 84:3;90:12;
92:16;93:2
**woman** 59:13;70:14,23
**word** 55:5